ATTORNEYS FOR APPELLANT
Susan K. Carpenter
Public Defender of Indiana

Steven H. Schutte
Deputy Public Defender

Thomas C. Hinesley
Deputy Public Defender

Kathleen Cleary
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

_____

## In the
# Indiana Supreme Court

_____

No. 41S00-0306-PD-249

MICHAEL DEAN OVERSTREET,

*Appellant (Petitioner below),*

v.

STATE OF INDIANA,

*Appellee (Respondent below).*

_____

Appeal from the Johnson Superior Court 2, No. 41D02-0401-PC-00001
The Honorable Cynthia S. Emkes, Judge

_____

On Appeal From The Denial Of Post-Conviction Relief

_____

**November 27, 2007**

**Rucker, J.**

## Summary

A jury convicted Michael Dean Overstreet of murder, rape, and criminal confinement in connection with the 1997 strangulation death of 18-year-old Kelly Eckart. The jury recommended a sentence of death, and the trial court accepted the recommendation. On direct appeal we affirmed Overstreet's conviction and sentence of death. Overstreet v. State, 783 N.E.2d 1140 (Ind. 2003), cert. denied, 540 U.S. 1150 (2004). Thereafter, Overstreet filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. He now appeals that denial raising several issues for our review, at least two of which are waived because they were known and available at the time of Overstreet's direct appeal,[1] and another three are barred because of the doctrine of res judicata.[2] We address the remaining issues, which we rephrase as follows: (a) was Overstreet denied the effective assistance of trial counsel; (b) was Overstreet denied the effective assistance of appellate counsel; (c) did Overstreet receive a fair post-conviction proceeding; and (d) is Overstreet incompetent to be executed because of his mental illness.

---

[1] As framed by Overstreet the two issues are: (a) "Overstreet's pretrial incompetence to assess the plea offer renders his death sentence unfair and unreliable" and (b) "The State's use of false evidence regarding Overstreet's post-crime conduct and the cause of Ms. Eckart's head wound violated due process." Br. of Appellant at 78, 80. If an issue was known on direct appeal but not raised, it is waived. Williams v. State, 808 N.E.2d 652, 659 (Ind. 2004).

[2] On direct appeal, citing Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), Overstreet challenged the trial court's refusal to give certain jury instructions. We rejected the challenge, determining that "the jury was instructed consistent with Apprendi and Ring." Overstreet, 783 N.E.2d at 1165. Wording his claim slightly differently Overstreet now attempts to revisit this issue contending his lawyers rendered ineffective assistance for their "failure to ensure the jury was properly instructed as to weighing," Br. of Appellant at 60, and "Overstreet's death sentence is unconstitutional under Ring v. Arizona and warrants reconsideration." Id. at 72. Also on direct appeal, Overstreet complained that the State engaged in prosecutorial misconduct in failing to disclose that Overstreet's wife had changed her testimony prior to trial. Thus, according to Overstreet, the trial court erred in not granting a mistrial. We disagreed, concluding that the prosecutorial misconduct did not require declaring a mistrial. Overstreet, 783 N.E.2d at 1155. Overstreet attempts to revisit this issue by now claiming that counsel rendered ineffective assistance for "Failure To Seek Dismissal Of Death Request As Remedy For Discovery Violation." Br. of Appellant at 51. A petitioner for post-conviction relief cannot escape the effect of claim preclusion merely by using different language to phrase an issue and define an alleged error. Reed v. State, 856 N.E.2d 1189, 1194 (Ind. 2006). Although differently designated, an issue previously considered and determined in a defendant's direct appeal is barred for post-conviction review on grounds of prior adjudication – res judicata. Id.

**Facts**[3]

A detailed recitation of the facts is set forth in our opinion on direct appeal. See Overstreet, supra. We summarize them here as follows. On September 30, 1997, the partially clothed body of Kelly Eckart was discovered in a ravine near Camp Atterbury in Brown County. She had been strangled to death with a strap from her bib overalls and a shoestring from her shoes. Three days before, in the early morning hours of September 27, 1997, Overstreet telephoned his brother Scott Overstreet and asked Scott to meet him at a motel in Franklin. Scott complied and met Overstreet in the motel parking lot. Overstreet informed Scott that he needed Scott to drive him in his van to Edinburgh. About fifteen minutes into the ride, Overstreet told Scott that he had changed his mind and now wanted to go to Camp Atterbury. When questioned why he wanted to go to Camp Atterbury, Overstreet replied, "I took a girl." Tr. at 3226. Scott drove to a gravel turnaround in a remote area of Camp Atterbury where he left the girl and Overstreet. Before doing so Overstreet asked Scott to return in a couple of hours and pick him up. Scott refused, and Overstreet instructed him to contact Overstreet's wife Melissa and tell her to drive the van and pick him up in a couple of hours at a nearby rifle range.

Melissa arrived at the rifle range around 3:30 a.m. As Overstreet approached the van, he was sweating, his shirt was unbuttoned, and he was carrying a blanket and a rifle. When Melissa asked why he was out so late at the rifle range, Overstreet responded that if anyone asked concerning his whereabouts she should tell them that he was out drinking with friends. Melissa drove Overstreet home, and he went to bed.

The following day, Melissa accompanied Overstreet to a car wash where he cleaned the back of his van. Despite the fact that the front part of the van was described by Melissa as "trashy," Overstreet spent over an hour cleaning only the back of the van. Tr. at 3883.

About a month after Eckart's body was discovered, police received a tip that led to the questioning of Scott about Kelly Eckart's disappearance. Scott led police to the gravel turnaround at Camp Atterbury, where police found several of Eckart's personal items.

---

[3] "Tr." refers to the trial transcript. "P-Cr." refers to the transcript of the post-conviction proceedings.

3

As a result of a search warrant, investigators recovered evidence from Overstreet's home, including the blanket Overstreet was carrying the night Melissa picked him up at the rifle range. They also recovered a hand drawn map of an area of Brown County near Camp Atterbury depicting the same area where Eckart's body was discovered. Fibers recovered from Eckart's shirt were consistent with fibers taken from the blanket. And fibers found on Eckart's overalls were consistent with fibers recovered from inside Overstreet's van. DNA testing revealed that sperm found inside Eckart's body and on her underwear was consistent with that of Overstreet.

**Procedural History**

The State charged Overstreet with murder, felony murder, rape as a Class B felony, and confinement as a Class B felony. Tr. at 923. The State sought the death penalty based on three aggravating circumstances: (a) Overstreet committed the murder by intentionally killing Kelly Eckart while committing or attempting to commit rape; (b) Kelly Eckart was the victim of rape for which Overstreet has been convicted; and (c) Kelly Eckart was the victim of confinement for which Overstreet has been convicted. Id. at 962.

The trial was held from April 24 through May 18, 2000. The jury convicted Overstreet as charged and recommended the death penalty. After conducting an independent evaluation the trial court accepted the jury's recommendation. Among other things the trial court determined that the State proved beyond a reasonable doubt that at least one of the charged aggravators, the intentional killing while committing rape, outweighed Overstreet's mitigating evidence, and that death was the appropriate sentence. The trial court then entered judgment for the murder, rape, and Class B felony confinement convictions and sentenced Overstreet to death. The trial court also imposed consecutive sentences of twenty years for each of the rape and criminal confinement convictions.

On direct appeal we affirmed Overstreet's convictions and death sentence. On Indiana double jeopardy grounds we reduced Overstreet's conviction for criminal confinement as a Class B felony to a Class D felony, vacated his sentence of twenty years for that offense, and remanded the cause to the trial court for resentencing. Thereafter, Overstreet filed a petition for post-

conviction relief, which the post-conviction court denied after a hearing. This appeal followed. Additional facts are discussed below as necessary.

## Standard of Review for Post-Conviction Proceedings

The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004). When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Id. To prevail from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. Weatherford v. State, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." Ben-Yisrayl v. State, 729 N.E.2d 102, 106 (Ind. 2000) (citation omitted).

## Standard of Review for Ineffective Assistance of Counsel

Most of Overstreet's complaints center on the alleged shortcomings of both his trial and appellate lawyers. To establish a post-conviction claim alleging a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish before the post-conviction court the two components set forth in Strickland v. Washington, 466 U.S. 668 (1984). Williams v. Taylor, 529 U.S. 362, 390 (2000). First, a defendant must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed to the defendant by the Sixth Amendment. Id. Second, a defendant must show that the deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious as to deprive the

5

defendant of a fair trial, meaning a trial whose result is reliable. Id. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. Ben-Yisrayl, 729 N.E.2d at 106.

## I.
## Ineffective Assistance of Counsel – Pre-Trial

Overstreet contends that trial counsel rendered ineffective assistance for failing to perfect a timely interlocutory appeal. The essential facts are these. Prior to trial, counsel filed a motion requesting the transcript and exhibits presented to the grand jury that was impaneled to investigate Scott's involvement in the death of Kelly Eckart. The trial court granted the motion. Thereafter counsel filed a motion specifically requesting the following additional grand jury information: comments made by the prosecutor when presenting the case to the grand jury, the instructions, and the charges or any information regarding the charges which the grand jury was considering. The trial court initially entered an order granting the motion. But upon the State's motion, the trial court reconsidered its order and, after conducting an *in camera* review of the requested information, denied counsel's motion. Counsel intended to pursue an interlocutory appeal from the trial court's order. But after missing the filing deadline, he tendered an appellant's brief to the Court of Appeals along with a motion for leave to file a belated appeal. The Court of Appeals denied the motion and dismissed the appeal. At the post-conviction proceedings, trial counsel testified that he sought the materials in order to challenge the manner in which the State presented to the grand jury Scott's involvement in Kelly Eckart's abduction and murder.

The post-conviction court determined that trial counsel rendered deficient performance by missing the deadline for filing an appellate brief. However, the court found that Overstreet failed to establish he was prejudiced as a result of the failure. See Kitchen v. United States, 227 F.3d 1014, 1017 (7th Cir. 2000) (finding that counsel was deficient in failing to pursue an appeal,

6

but the deficiency was not prejudicial).  We agree with the post-conviction court.  At trial the State elicited testimony from Scott that he was a target of the grand jury investigation.  Trial counsel aggressively cross-examined Scott, challenging his credibility, discussing his conduct on the night of the murder, and exploring his testimony before the grand jury.  During closing remarks trial counsel argued that Scott's testimony was not worthy of belief.  Overstreet has made no showing that the post-conviction court's finding is clearly erroneous.

## II.
## Ineffective Assistance of Counsel – Guilt Phase[4]

Overstreet sets forth a number of assertions that he contends demonstrate counsel rendered ineffective assistance during the guilt phase of trial.  Consolidated, rephrased, and reordered, those claims are as follows: (a) counsel failed to present evidence of Overstreet's mental illness; (b) counsel failed to impeach adequately the testimony of Overstreet's wife; and (c) counsel failed to object to an alleged evidentiary harpoon.  We address each assertion in turn.

### A.  Evidence of Mental Illness

The record shows that by the time of trial Overstreet had been diagnosed by at least four mental health professionals.  Three mental health professionals diagnosed Overstreet as suffering from "schizotypal personality disorder" and found that he had a "severely disturbed personality structure."  Tr. at 5078-79; Tr. at 5092 (Pre-trial reports from both psychiatrist Dr. Fitzgerald and Navy clinical psychologist A.S. Hughes were submitted as part of Defendant's Exhibit CC.).  Another diagnosed Overstreet with Schizoaffective Disorder, which is a combination of schizophrenia and major depression.  App. at 680.  No evidence of Overstreet's mental illness was presented during the guilt phase of trial.  Overstreet concedes, "Insanity was not a viable theory, as no expert was prepared to testify that [he] was unable to appreciate the wrongfulness

---

[4] Under the heading "Omitted Evidence Consistent With Defense Presented" Overstreet sets forth a laundry list of "Other Evidence Implicating Scott Overstreet."  Br. of Appellant at 53.  He cites to no authority and makes no cogent argument supporting a claim of ineffective assistance of counsel.  Any such claim under this heading is waived.  See Ind. Appellate Rule 46(A)(8)(a); Harrison v. State, 707 N.E.2d 767, 777 (Ind. 1999).

7

of his actions." Br. of Appellant at 35. But Overstreet complains that trial counsel nonetheless should have presented evidence of his mental illness. According to Overstreet, "If trial counsel had contested Overstreet's *mens rea* due to mental illness, the jury could have had the option of returning a verdict of Guilty but Mentally Ill (GBMI)." Id.

The flaw in this contention is that Overstreet's defense theory centered on attempting to prove that someone other than Overstreet committed the offenses, namely, Overstreet's brother Scott. Trial counsel had no reason therefore to raise the issue of mental capacity. Arguing that Overstreet lacked the mental capacity to form the necessary intent would have been contrary to his claim. Overstreet contended that he did not commit the crime, not that he did not intend to commit the crime.[5] See Meredith v. State, 679 N.E.2d 1309, 1312 (Ind. 1997) (rejecting the claim that counsel rendered ineffective assistance for failing to raise diminished capacity during the guilt phase of trial where the defense theory was that someone other than the defendant committed the murder). The choice of defenses for trial is a matter of trial strategy. Van Evey v. State, 499 N.E.2d 245, 248 (Ind. 1986). Overstreet has failed to demonstrate that counsel's strategic decisions fell below an objective standard of reasonableness.

### B. Inadequate Impeachment

Overstreet complains that counsel rendered ineffective assistance for their "Failure to Impeach Melissa Overstreet with Lead Investigator's Report." Br. of Appellant at 50. As recounted in the facts section of this opinion, Overstreet's wife testified about a van-cleaning incident occurring the day after she picked up Overstreet from the rifle range near Camp Atterbury. According to Overstreet, the lead investigator for the defense had questioned Overstreet's employer who allegedly reported that Overstreet was at work during the time Melissa testified he was cleaning the van. Overstreet argues that trial counsel should have used this information to impeach Melissa on this "critical" point. Id. at 51.

---

[5] Indeed, discussing his case with his mental health professionals, Overstreet not only insisted that he did not commit the crimes for which he was charged, he also insisted that he had no memory of much of the events occurring on the evening Kelly Eckart was abducted. App. at 687, 733, 736.

We first observe that the critical point was the cleaning of the van itself. And trial counsel exhaustively cross-examined Melissa on this issue asking a wide range of questions including her failure to disclose this information during either her grand jury testimony, her pretrial deposition, or in various statements given to different law enforcement agencies. Tr. at 4070-71. Second, during questioning outside the presence of the jury, Melissa testified that she knew that "[Overstreet] cleaned the van, but [she] ha[d] to sort out the time lines." Id. at 3959. As the post-conviction court observed, the impeachment value of information that Overstreet was at work at the time Melissa testified that he was cleaning the van was minimal in that she would merely have testified that her dates were wrong and that the cleaning of the van occurred on another day. We agree with the post-conviction court.

### C. Evidentiary Harpoon

The record shows that prior to trial the trial court ordered certain evidence held in the custody of the Indiana State Police laboratory released to a DNA laboratory designated by the defense team. At trial the State sought to introduce several items of evidence including blood and hair samples held in the State Police laboratory. In establishing a chain of custody, and in response to questioning by the State, the State's witness twice testified that the items had been sent off for some additional testing at the request of the defense attorney. Tr. at 4328, 4336. Later, the State inquired, "Sir, you've indicated that several of the items that we've talked about here and that we've admitted were sent to the Defense's laboratory for testing; correct?" Id. at 4368. Trial counsel objected and at a side bar noted that he had allowed the answers to those questions to show chain of custody, but argued "if he goes any farther with it, he's infringing on the Defendant's right not to present any evidence and shifting the burden, and we'll ask for [an] immediate mistrial if he goes one step farther with it." Id. The State then withdrew the question.

Characterizing the two earlier responses as "evidentiary harpoons," Overstreet complains that counsel rendered ineffective assistance for failing to object in the first instance. Br. of Appellant at 52. First, an evidentiary harpoon occurs when the prosecution places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jury against the defendant and his defense. Evans v. State, 643 N.E.2d 877, 879 (Ind. 1994). Even assuming the

9

challenged testimony was inadmissible, we are not persuaded it was introduced for the deliberate purpose of prejudicing the jury. Rather, it is apparent that the references were made in the context of the State establishing a chain of custody – a point on which the State bears a higher burden for "fungible" evidence, such as blood and hair samples. Troxell v. State, 778 N.E.2d 811, 814 (Ind. 2002). In short, absent a stipulation by the defense, the State had to account for the whereabouts of the evidence that was not in its possession and control for a period of time. Second, in order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show an objection would have been sustained if made. Wrinkles v. State, 749 N.E.2d 1179, 1192 (Ind. 2001) (citing Timberlake v. State, 690 N.E.2d 243, 259 (Ind. 1997)). We agree that the responses at the "request of the defense attorney" were objectionable. An objection to this reference and a motion to strike likely would have been sustained. But trial counsel cannot be faulted for his strategy of declining to object. There was no need to bring unnecessary attention to this matter arising as it did in the context of the State establishing a chain of custody. In sum, Overstreet has not shown that counsel's conduct was objectively unreasonable.

## III.
### Ineffective Assistance of Counsel – Penalty Phase

Overstreet argues that his trial lawyers were ineffective at the penalty phase of trial because they: (a) misled the jury with an inaccurate stipulation; (b) failed to present additional mitigation evidence; (c) allowed spectators in the courtroom to wear buttons with a picture of the victim; (d) did not object to Overstreet wearing handcuffs; (e) failed to contest adequately the State's DNA evidence; and (f) failed to present evidence negating aggravation. We address each contention in turn.

### A. Inaccurate Stipulation

Overstreet complains about his lawyers' conduct of introducing into evidence a stipulation informing the jury that Overstreet's mental health experts rendered identical opinions and diagnoses. This allegation is based on the following facts. Trial counsel retained the

services of three mental health professionals: Dr. Eric Engum, a neuropsychologist, Dr. Robert Smith, a clinical psychologist, and Dr. Philip Coons, a forensic psychiatrist. The only mental health expert that testified at the penalty phase of trial was Dr. Engum. He had conducted a broad-ranging psychological evaluation of Overstreet consisting of a clinical interview and an extended mental status examination, including psychological history and testing. Among other things, Dr. Engum testified that Overstreet had a "severely disturbed personality structure." Tr. at 5078. Dr. Engum concluded that Overstreet had a "schizotypal personality disorder," which he described as "among the most severe of the personality disorders." Id. at 5122. According to Dr. Engum, Overstreet was severely mentally ill, although he was not psychotic at the time of the offense. Noting that he also holds a law degree, Dr. Engum testified that Overstreet's mental illness satisfied a statutory mitigating factor in that it was an extreme mental or emotional disturbance that substantially impaired Overstreet's ability to conform his conduct to the requirements of law. Id. at 5135-36. See Ind. Code § 35-50-2-9(c).

Counsel was in possession of a report from Dr. Smith that showed he had diagnosed Overstreet with a schizoaffective disorder. He would later testify at the post-conviction hearing that Overstreet's schizoaffective disorder is a combination of schizophrenia and depression. Dr. Smith's pre-trial report concluded that Overstreet's mental illness "played a significant role in his involvement in the instant offense." App. at 681.

Dr. Smith was not called to testify at the penalty phase of trial. Instead, counsel read into evidence a stipulation that provided in pertinent part that Dr. Smith examined Overstreet, that he rendered an opinion, and that "Dr. Smith's opinion and diagnosis [are] identical to that of Dr. Eric Engum." Tr. at 5190. Complaining that Dr. Smith's diagnosis is not identical to that of Dr. Engum,[6] Overstreet maintains that the stipulation was "false," misled the jury, and that counsel's conduct in presenting the stipulation to the jury amounts to ineffective assistance.

---

[6] At the post-conviction hearing, Dr. Smith confirmed that his diagnosis was not the same as Dr. Engum, P-Cr. at 517, and testified that he had in fact diagnosed Overstreet as suffering from schizophrenia and major depression, i.e. schizoaffective disorder. Id. at 522-23.

11

The crux of Overstreet's argument is the assertion that a schizoaffective disorder is a more severe mental illness than a schizotypal personality disorder. Thus, the argument continues, "[Dr.] Smith's testimony would have been significantly more helpful to Overstreet's mitigation case than [Dr.] Engum's." Br. of Appellant at 38.

Assuming the accuracy of Overstreet's assertion, he has failed to show that the outcome of the penalty phase of trial would have been any different. First, it is not at all clear that a lay jury would necessarily appreciate the subtle and nuanced distinction between a schizoaffective disorder and a schizotypal personality disorder. In any event, the jury heard extensive testimony from Dr. Engum about the seriousness of Overstreet's mental illness. As recited above Dr. Engum testified, among other things, that Overstreet was severely mentally ill, that Overstreet's mental illness was an extreme mental or emotional disturbance, and that Overstreet's schizotypal personality disorder substantially impaired his ability to conform his conduct to the requirements of the law. At sentencing the trial court considered the reports of both Dr. Smith and Dr. Engum.[7] We conclude not only has Overstreet failed to show that the conduct of counsel in entering into what may have been an inaccurate stipulation fell below an objective standard of reasonableness, but also he has failed to show any prejudice resulted from counsel's conduct.

*B. Additional Evidence of Mitigation*

Overstreet contends that counsel rendered ineffective assistance for failing to present additional mitigation evidence to the jury. More specifically he faults counsel for not calling to testify his two additional mental health experts, Dr. Smith and Dr. Coons, and failing "to present Overstreet's traumatic family background." Br. of Appellant at 39.

---

[7] Acknowledging the stipulation "eliminat[ed] the need for Dr. Smith to testify," the court noted that "[b]oth doctors submitted reports that were attached to the Defendant's Sentencing Memorandum" and that "[b]oth Dr. Smith and Dr. Engum urge[d] the Court to find the two defense mitigators present in this case, namely, that the Defendant was under the influence of extreme mental or emotional disturbance when the murder was committed and that the Defendant's capacity to appreciate the criminality of the Defendant's conduct or to conform that conduct to the requirements of the law was substantially impaired as a result of mental disease." Tr. at 1300–01.

12

As for claim number one, Overstreet recasts much of the same argument that we disposed of under section A. That is, he complains that the jury did not hear the testimony of mental health professionals that diagnosed Overstreet with a more serious form of mental illness. We decline to address this point any further. Concerning claim number two, Overstreet is mistaken. The record shows that at the penalty phase of trial, among other witnesses, counsel presented the testimony of Overstreet's mother. She testified about the substance abuse of Overstreet's father, domestic violence and alcoholism, and gave a detailed picture of Overstreet's childhood as well as his adult life. Tr. at 4993-94; 5005-06. In addition, Overstreet's school and childhood mental health records were introduced into evidence detailing Overstreet's social and mental health history. Id. at 5066, 5092.

This Court acknowledges the importance of presenting mitigating evidence, particularly in capital cases. Harrison, 707 N.E.2d at 783. We have held that the failure to present mitigating evidence constitutes ineffective assistance of counsel, warranting the vacation of a death sentence. Id. (citing Burris v. State, 558 N.E.2d 1067, 1076 (Ind. 1990) and Smith v. State, 547 N.E.2d 817, 822 (Ind. 1989)); see also Prowell v. State, 741 N.E.2d 704, 717 (Ind. 2001). But that is not to say that counsel is required to present all available mitigation evidence. Indeed after some investigation of a defendant's background, even a reasonable decision to present no evidence of a defendant's unstable childhood "complies with the dictates of Strickland." Burris, 558 N.E.2d at 1075. Thus, counsel is permitted to make strategic judgments not to present certain types of mitigating evidence. Canaan v. State, 683 N.E.2d 227, 234 (Ind. 1997); see also Timberlake, 690 N.E.2d at 261 ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase.").

In this case counsel did not fail to present mitigating evidence. In fact, the trial court recognized that "without a doubt, he had an abnormal childhood," and he "was raised in a very dysfunctional family and he does come from a broken home." Tr. at 5460. After employing a mitigation specialist and conducting an investigation into Overstreet's background, counsel made a strategic decision concerning the type and extent of mitigating evidence to present to the jury. This conduct does not fall below an objective standard of reasonableness.

13

*C. Spectators Wearing Buttons*

Overstreet complains that counsel failed "To Object To Prejudicial Symbols Of Mourning In The Gallery." Br. of Appellant at 46. He implies that the wearing of buttons by spectators was an attempt to influence the jury and argues it was inherently prejudicial to his right to a fair trial.

The record establishes the following facts. At the post-conviction hearing Overstreet's trial counsel testified that at some point during trial they observed some spectators in the gallery wearing buttons with the picture of Kelly Eckart. P-Cr. at 25-26, 69. Affidavits from four jurors were also introduced. Although worded slightly differently they provided in relevant part, "I was able to observe spectators in the courtroom. Some of these people wore ribbons and button[s] with pictures of Kelly Eckart." App. at 793, 797, 799, 801. No other evidence was presented concerning the buttons.

This issue appears to be one of first impression in Indiana. There are several cases from other jurisdictions in which the wearing of certain items of clothing or accessories led to a determination that the defendant was denied a fair trial. See, e.g., Woods v. Dugger, 923 F.2d 1454, 1460 (11th Cir. 1991) (finding the presence of numerous uniformed prison guards in the audience of a trial for the murder of a prison guard deprived defendant of a fair trial), cert. denied, 502 U.S. 953 (1991); Norris v. Risley, 918 F.2d 828, 834 (9th Cir. 1990) (finding the presence of spectators wearing large buttons with the slogan "Women Against Rape" in the audience of a trial for kidnapping and sexual intercourse without consent deprived defendant of a fair trial); State v. Franklin, 327 S.E.2d 449, 455 (W. Va. 1985) (finding the defendant was deprived of a fair trial when several spectators, including the sheriff, wore MADD lapel buttons during a trial for driving under the influence which resulted in death).

But jurisdictions have diverged widely in their treatment of what has been characterized as defendants' spectator-conduct claims. Several courts have rejected claims that defendants have been prejudiced by display of items worn by spectators. See, e.g., Billings v. Polk, 441 F.3d 238, 247 (4th Cir. 2006) (declaring that existing precedent "do[es] not clearly establish that

14

a defendant's right to a fair jury trial is violated whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury"), cert. denied, 127 S. Ct. 932 (2007); State v. Lord, 165 P.3d 1251, 1258-59 (Wash. 2007) (finding no constitutional infringement on the right to a fair trial when buttons bear the victim's picture but contain no message); Davis v. State, 223 S.W.3d 466, 474-75 (Tex. Ct. App. 2006) ("Appellant does not cite any authority holding the display of [medallions bearing the victim's picture] by spectators creates inherent prejudice."); In re Woods, 114 P.3d 607, 617 (Wash. 2005) (concluding that ribbons worn by spectators did not prejudice the defendant); State v. Speed, 961 P.2d 13, 30 (Kan. 1998) (finding no error in trial court's refusal to direct spectators to remove buttons and t-shirts); State v. Braxton, 477 S.E.2d 172, 177 (N.C. 1996) (finding no error in the trial court refusing to declare a mistrial because spectators were wearing badges with pictures of one of the victims).

We are guided by the United States Supreme Court's recognition that certain courtroom practices are inherently prejudicial because they deprive the defendant of a fair trial by creating an unacceptable risk of impermissible factors coming into play. Holbrook v. Flynn, 475 U.S. 560, 570 (1986) (The seating of four uniformed state troopers in seats immediately behind the defendant at trial was not so inherently prejudicial that it denied the defendant a fair trial. Rather "the question must be . . . whether an *unacceptable* risk is presented of impermissible factors coming into play.") (emphasis added) (quotation omitted).

In a recent decision, the Supreme Court determined it was not contrary to or an unreasonable application of clearly established federal law for a state court to hold that buttons displaying the victim's image and worn by the victim's family did not deny the defendant his right to a fair trial. Carey v. Musladin, 127 S. Ct. 649, 654 (2006). In that case, in which the defendant was convicted of first-degree murder and three related offenses. On at least some of the fourteen days of trial, some members of the victim's family wore buttons with a picture of the victim. Prior to opening statements counsel moved the trial court to order the victim's family not to wear the buttons during trial. The trial court denied the motion stating that it saw "no possible prejudice to the defendant." Id. at 652. On direct review the California Court of Appeals affirmed the conviction. On subsequent habeas review the Ninth Circuit Court of

15

Appeals reversed, finding that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.[8]  Granting certiorari the Supreme Court disagreed, vacated the Court of Appeals' judgment, and remanded the case for further proceedings.  In a concurring opinion, Justice Souter observed:

> [O]ne could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations.  The display is no part of the evidence going to guilt or innocence, and the buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and a call for some response from those who see them.  On the jurors' part, that expected response could well seem to be a verdict of guilty, and a sympathetic urge to assuage the grief or rage of survivors with a conviction would be the paradigm of improper consideration.  The only debatable question is whether the risk in a given case reaches the 'unacceptable' level.

Id. at 657-58 (Souter, J., concurring in the judgment).  We agree with these observations.

In this case Overstreet has not shown that counsel rendered deficient performance for failing to object or otherwise move the trial court for an order directing spectators not to wear buttons.  For example, there is nothing in this record that tells us the size of the buttons, how easy it was for the jurors to see the picture on the buttons, the number of spectators wearing the buttons, how many days of trial the buttons were worn or, more importantly, whether any juror was in any way affected by the buttons.  On this record it is simply impossible to determine whether the risk of any improper considerations rose to an unacceptable level.  It is only at the

---

[8] Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

unacceptable level of risk that any plausible argument can be made that counsel's inaction fell below the objective standard of reasonableness.

### D. Use of Restraints

Overstreet next complains of "Counsel's Failure To Object To The Use Of Restraints In The Courtroom." Br. of Appellant at 48. The facts are these. The trial record is silent regarding Overstreet's appearance before the jury in restraints. At the post-conviction hearing one of Overstreet's lawyers testified "yes" to the question of whether he recalled seeing Overstreet in handcuffs in the courtroom and elaborated that he thought there was no need for handcuffs, because counsel "never saw anything that would indicate [Overstreet] was going to do anything." P-Cr. at 68. Counsel was not questioned further on this issue.

Overstreet also introduced into evidence at the post-conviction hearing the affidavits of two jurors. In relevant part they provided, "[o]n one occasion, I recall that the jury was already present in the jury box when the defendant was brought into the courtroom wearing handcuffs." App. at 795, 797. The State introduced into evidence affidavits from both jurors who clarified that the foregoing incident "happened only once" and that "when deputies brought Mr. Overstreet into the courtroom after the jury had been seated in the jury box, Mr. Overstreet's handcuffs were immediately removed and he sat down at counsel's table unrestrained." Id. at 803, 805.

There was extended colloquy between defense counsel and the post-conviction court judge (who also served as the trial judge in this case) about whether Overstreet was alleging being handcuffed during the guilt or penalty phase of trial. When specifically asked which phase of trial to which Overstreet was referring, counsel responded, "We can't be that specific, we don't know whether it was guilt phase or penalty phase, in front of a jury, yes. I don't believe we know." P-Cr. at 111. The court responded, "I have absolutely no doubt in my mind that before that jury was brought in every day during jury selection and during the guilt phase, that he was not handcuffed and he was not shackled and I know the officers were under strict orders in

17

that regard . . . .  The penalty phase is another issue.  I, I do not have a recollection in regard to the penalty phase."  Id. at 111-12.

In its findings of fact the post-conviction court did not specifically resolve the question of what phase of trial some jurors might have seen Overstreet in handcuffs.  However, in rejecting Overstreet's ineffective assistance claim, the post-conviction court concluded, "Petitioner has failed to show by a preponderance of the evidence that jurors who saw Petitioner in handcuffs did so during the guilt phase of the trial . . . ."  App. at 486.  Overstreet does not contest this conclusion but asserts that he "presumes this incident occurred during [the] penalty phase."  Br. of Appellant at 48.

As a general proposition a defendant has the right to appear before a jury without physical restraints, unless such restraints are necessary to prevent the defendant's escape, to protect those present in the courtroom, or to maintain order during trial.  Bivins v. State, 642 N.E.2d 928, 936 (Ind. 1994).  This right arises from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt.  Wrinkles, 749 N.E.2d at 1193.  For this presumption to be effective, courts must guard against practices that unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion.  Id. (citing Holbrook, 475 U.S. at 567-68; Estelle v. Williams, 425 U.S. 501, 503 (1976)).

In arguing that trial counsel rendered ineffective assistance for failing to object to his being handcuffed in front of the jury, Overstreet relies in part on Deck v. Missouri, 544 U.S. 622 (2005).  In that case the United States Supreme Court declared that routine shackling during the penalty phase of a capital trial, without a case-specific finding that security needs justify the shackling, violates a defendant's due process rights unless the state shows beyond a reasonable doubt that the shackling did not contribute to the verdict.  Id. at 633, 635.

18

There are at least two problems with Overstreet's claim. First, <u>Deck</u> established a new rule that does not apply retroactively here.[9] Prior to <u>Deck</u>, Supreme Court precedent concerning shackling in the presence of the jury did not involve the penalty phase of a capital trial. Rather, prior precedent involved shackling only before a determination of guilt. See <u>Illinois v. Allen</u>, 397 U.S. 337, 344 (1970) (holding that "no person should be *tried* while shackled and gagged except as a last resort") (emphasis added). In fact, until <u>Deck</u>, the Supreme Court had not at all addressed what one court has characterized as the "very different issue of shackling during the penalty phase of a capital trial where the defendant has already been convicted of a serious, violent crime by the jury." <u>Marquard v. Sec'y for Dep't of Corr.</u>, 429 F.3d 1278, 1311 (11th Cir. 2005) (rejecting a capital defendant's claim of ineffective assistance for counsel's failure to object to defendant appearing before the jury in shackles during the penalty phase of trial), <u>cert. denied</u>, 126 S. Ct. 2356 (2006). Indeed the reasoning supporting the pre-conviction precedent did not dictate its applicability to the penalty phase of a capital trial. Where a defendant is handcuffed before the jury, the paramount constitutional concern expressed by prior Supreme Court precedent is that the sight of a shackled defendant could suggest that the defendant is guilty. <u>Allen</u>, 397 U.S. at 344. In the penalty phase of a capital case, the defendant's guilt has already been established.

Therefore, the underlying rationale of the Supreme Court's pre-conviction precedent did not dictate the penalty-phase rule established by <u>Deck</u>. We have previously observed the distinction between the guilt and penalty phases of trial. See <u>French v. State</u>, 778 N.E.2d 816, 821 (Ind. 2002) (After recognizing that the presumption of innocence no longer applies to the sentencing proceedings or the habitual offender phase, the Court found it was not a fundamental error to require the defendant to wear jail clothing, handcuffs, and shackles in front of a new jury for the habitual offender phase of trial.). This distinction also has been echoed in other jurisdictions as well. See, e.g., <u>Hall v. Luebbers</u>, 296 F.3d 685, 699 (8th Cir. 2002) (finding the use of shackles during the penalty phase would not necessarily lead jurors to conclude they must

---

[9] Under <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989) (plurality opinion), "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government [or] . . . if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." In <u>Daniels v. State</u>, 561 N.E.2d 487, 489 (Ind. 1990), this Court adopted for Indiana the same principles of retroactivity as those announced in <u>Teague</u>.

19

impose a death sentence); Marquez v. Collins, 11 F.3d 1241, 1244 (5th Cir. 1994) (noting that the risk of prejudice is lessened when the complained of restraint comes only in the sentencing phase of a capital charge because the jury has just convicted the defendant for a violent crime); Bowers v. State, 507 A.2d 1072, 1078 (Md. 1986) (recognizing that being in the position of a convicted felon is unlike the ordinary defendant who at trial stands clothed in the presumption of innocence).

We emphasize that at the time of Overstreet's trial there was no clear constitutional, statutory, or common-law prohibition to a defendant appearing in handcuffs before a jury during the penalty phase of a capital trial. Thus, even if counsel had objected to the handcuffs, the trial court would not have erred in overruling the objection. And counsel's representation cannot be deemed to have fallen below an objective standard of reasonableness for failing to anticipate a change in the law. Harrison, 707 N.E.2d at 776 (stating the failure to anticipate or effectuate a change in the existing law does not constitute ineffective assistance under Strickland).

Overstreet's claim fails for another reason as well. The post-conviction court found, among other things, "It is obvious from the totality of the evidence in favor of the Petitioner on this issue that any observation of the Petitioner in handcuffs was brief and inadvertent and not something the court allowed to happen on a regular basis during the trial." App. at 486. Overstreet does not challenge this finding.

Deck forbids the use of visible restraints only during the guilt and penalty phases of courtroom proceedings. The Supreme Court has not addressed the use of restraints when a criminal defendant in police custody is being moved about the courthouse. Indeed throughout both the majority and dissenting opinions in Deck there is consistent use of language clearly indicating that being shackled during the entire proceeding, as opposed to being briefly and inadvertently seen entering the courtroom in shackles, is what the Constitution forbids. This Court has long determined that a defendant is not automatically entitled to relief based on jurors momentarily seeing a defendant in restraints while being transported about the courthouse. See, e.g., Underwood v. State, 535 N.E.2d 507, 518 (Ind. 1989) (finding that absent a showing of actual harm, the defendant was not entitled to mistrial on grounds that jurors saw him in

20

handcuffs while in transit to jail); <u>Smith v. State</u>, 475 N.E.2d 1139, 1144 (Ind. 1985) (finding no abuse of discretion in allowing jury to see defendant wearing handcuffs and shackles while being transported to courthouse). A number of jurisdictions have embraced this view as well.[10]

We acknowledge that the foregoing authority pre-dates <u>Deck</u>. But for reasons already expressed we believe it survives <u>Deck</u> and is still good law. We conclude therefore that, assuming for the sake of argument counsel's conduct in failing to object to a "brief and inadvertent" jury observation of Overstreet in handcuffs fell below an objective standard of reasonableness, Overstreet still has failed to show that but for counsel's error the outcome of the penalty phase of trial would have been different. That is to say, Overstreet has failed to show that but for the inadvertent and brief glimpse of Overstreet in restraints the jury would have returned a verdict recommending a sentence of a term of years rather than a death sentence. <u>See Fountain v. United States</u>, 211 F.3d 429, 436 (7th Cir. 2000) (finding petitioner failed to establish prejudice because an objection to the shackling would not have likely altered the result).

### E. Failure to Contest Adequately the State's DNA Evidence

Overstreet complains that counsel rendered ineffective assistance because they "did not consult with an expert in population genetics" to refute the State's DNA evidence. Br. of Appellant at 56. Here are the essential facts. The State's DNA evidence consisted primarily of swabs and slides from Eckart's sexual assault kit. At trial, State Police DNA analyst Jennie Wood testified that, using short tandem repeat ("STR") testing, the sperm found in Eckart's

---

[10] "Most courts now agree . . . that a defendant is not denied a fair trial and is not entitled to a mistrial solely because he was momentarily and inadvertently seen in handcuffs by jury members." <u>State v. Jones</u>, 328 A.2d 41, 44 (N.J. Super. Ct. Law Div. 1974) (collecting cases); <u>see also</u> <u>United States v. Lattner</u>, 385 F.3d 947, 959 (6th Cir. 2004), <u>cert. denied</u>, 543 U.S. 1095 (2005) (holding that the defendant was "not entitled to a new trial simply because several jurors briefly observed him in handcuffs while he was being escorted onto an elevator"); <u>United States v. Olano</u>, 62 F.3d 1180, 1190 (9th Cir. 1995) ("[A] jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant."); <u>Allen v. Montgomery</u>, 728 F.2d 1409, 1413 (11th Cir. 1984) (holding that a defendant's rights were not violated where jurors saw a brief glimpse of the defendant in handcuffs which "were removed as soon as he was brought into the courtroom"); <u>Wright v. Texas</u>, 533 F.2d 185, 187 (5th Cir. 1976) ("We have consistently held that a brief and fortuitous encounter of the defendant in handcuffs by jurors is not prejudicial and requires an affirmative showing of prejudice by the defendant.").

underwear was consistent with Overstreet's DNA profile with a statistical significance of 1 in 12 billion. Another analyst called by the State, Dr. Michael Conneally, reached the same conclusion. Dr. Conneally also examined a vaginal slide that showed a mixture to which Overstreet and Eckart could be contributors. Using both STR and polymerase chain reaction ("PCR") testing, Dr. Conneally concluded that the sperm found was consistent with Overstreet's profile with a statistical significance of 1 in 4 trillion.

Overstreet's defense team had hired an independent laboratory to analyze the State's DNA evidence. Although trial counsel vigorously cross-examined the State's witnesses, for reasons neither the trial record nor the post-conviction record reveals the results of the independent laboratory were not introduced into evidence. Also, defense counsel did not call an expert witness to rebut the State's DNA evidence.

At the post-conviction hearing defense DNA analyst Dr. Laurence Mueller, a population geneticist, disagreed with the methodology Dr. Conneally used to reach the 1 in 4 trillion conclusion. Dr. Mueller did not indicate what his conclusion would have been using a different methodology. With regard to the sample taken from the victim's body, he also testified that data from the Indiana Police laboratory suggested that although Overstreet could not be excluded as a possible contributor, another unknown person could have contributed the DNA found on the vaginal slides. In rebuttal, Dr. Conneally disagreed.

Overstreet argues that Dr. Mueller's testimony of the possibility of another sperm donor on the vaginal swabs should have been presented to the fact-finders. According to Overstreet, he "was prejudiced at penalty and sentencing phase, because this evidence would, when combined with other evidence presented at PCR, diminish his culpability." Br. of Appellant at 56.

Major participation in the killing coupled with a culpable mental state is needed to satisfy constitutional requirements in finding the intentional killing while committing a rape aggravator. See Ajabu v. State, 693 N.E.2d 921, 937 (Ind. 1998). This issue often surfaces when determining who, among two or more actors accused of committing a crime, acted as principals and accomplices. This is because although "an accomplice may be found guilty of the crime

22

largely executed by his principal, it does not follow that the same penalty is appropriate." Martinez Chavez v. State, 534 N.E.2d 731, 735 (Ind. 1989).

Here, the evidence Overstreet presented goes to the possibility that a third party, presumably Overstreet's brother Scott, may have participated in Eckart's rape and murder. It does not, as Overstreet argues, address his own culpability. Further, although the evidence might implicate a third party, it does not disprove Overstreet's major participation in these crimes. See Saylor v. State, 765 N.E.2d 535, 556 (Ind. 2002) (rejecting the claim that counsel rendered ineffective assistance for failing to introduce additional evidence of mitigation implicating a third party in the murder of the victim), rev'd on other grounds. In sum, Overstreet has failed to demonstrate that had this additional evidence been introduced, the outcome of the penalty phase of trial would have been any different.

### F. Evidence Negating Aggravation

Overstreet complains that counsel rendered ineffective assistance for failing to secure an expert on eyewitness identification to challenge the testimony of one of the State's witnesses.[11] The record shows that at trial the State called Amanda Chittum who testified that she saw Overstreet around noon on September 30, 1997, when her vehicle nearly collided with Overstreet's van at a location close to the site where Eckart's body was discovered. According to Chittum, Overstreet's van almost came to a complete stop, the vehicles were within 10 to 15 feet of each other, and she got a good look at Overstreet's face. At the post-conviction hearing Dr. Roger Terry, an eyewitness identification expert, testified and noted probable problems with the accuracy of Chittum's memory. Overstreet asserts, "If the judge and jury had heard from an expert like Terry, and become fully educated in the weaknesses in Chittum's testimony, there would have been a reasonable probability of a different sentencing result." Br. of Appellant at

---

[11] In addition to this assertion, under the heading "Failure To Present Evidence Negating Aggravation," Br. of Appellant at 57, Overstreet makes two additional claims: (1) counsel rendered ineffective assistance for their "Failure To Challenge (b)(1) Intent With Mental Health" and (2) counsel "Fail[ed] To Ensure The Jury Was Properly Instructed As To Weighing." Id. at 60. Using slightly different language, both claims, which incidentally appear in four and three sentence paragraphs respectively, are a rehash of issues we have already addressed in Part III. A (discussing evidence of mental illness presented to the jury) and footnote 2 (discussing res judicata bar related to Apprendi and Ring). We decline to discuss these issues further.

To support this assertion Overstreet contends, "In sentencing Overstreet to death the trial court relied in part on Chittum's testimony in finding that Overstreet had a 'lurid mind.'" Id. (quoting Tr. at 1294).

Both the assertion and the contention border on the frivolous. First, the State alleged three aggravating circumstances: Overstreet committed the murder by intentionally killing Kelly Eckart while committing or attempting to commit rape; Kelly Eckart was the victim of rape for which Overstreet has been convicted; and Kelly Eckart was the victim of confinement for which Overstreet has been convicted. Tr. at 962. Overstreet does not explain, and we cannot discern, how a challenge to Chittum's eyewitness identification could have any bearing on negating the State's alleged aggravators.

As for the trial court's reference to Overstreet's "lurid mind," the record shows that in conducting an independent review of the jury's death sentence recommendation the trial court entered a twenty-seven-page sentencing order that included the following:

> The Court finds that the aggravating factor found herein that the Defendant intentionally killed Kelly Eckart while committing rape should be given substantial weight and great consideration. All of the factors as cited herein in paragraphs 15(b)(1) through 15(b)(9) point to the unmistakable conclusion that the defendant planned to abduct an unwitting and unsuspecting person on the evening of September 26, 1997. The Defendant had a weapon and a plan he intended to follow through with. The Defendant acted on his sinister plan by disabling his victim, raping her, killing her by strangling her with her own clothing, and dumping her partially clothed body in an area he had mapped out in advance to end his plan. The acts of the defendant were calculated, cold-blooded, merciless, and sinister from beginning to end. As further testimony to the Defendant's lurid mind, the Defendant destroyed evidence in his van, tried to hide the victim's shoes and socks, involved and threatened his brother, and approximately four (4) days after he threw the victim's body into a ravine, he visited the site again for no apparent reason. The manner in which the crime was committed, the motivation, the Defendant's actions to conceal the body and other evidence of the crimes, as well as other attendant circumstances of the crime, are the type of considerations which augment the value of this aggravator.

24

Tr. at 1294. From the foregoing recitation, it is readily apparent that evidence Overstreet revisited the location where Eckart's body was found – presumably corroborated by the testimony of Chittum – played a rather insignificant role in the trial court's determination of the substantial weight given to the intentional killing while committing rape aggravator. There is simply nothing in the record to support the notion that the trial court would have imposed, or the jury would have recommended, a sentence other than death had there been a more thorough challenge to Chittum's testimony. There was no ineffective assistance of counsel associated with this claim.

## IV.

### Ineffective Assistance of Appellate Counsel

The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel in that the petitioner must show appellate counsel was deficient in her performance and that the deficiency resulted in prejudice. Bieghler v. State, 690 N.E.2d 188, 193 (Ind. 1997). To satisfy the first prong, the petitioner must show that counsel's performance was deficient in that counsel's representation fell below an objective standard of reasonableness and that counsel committed errors so serious that petitioner did not have the "counsel" guaranteed by the Sixth Amendment. McCary v. State, 761 N.E.2d 389, 392 (Ind. 2002). To show prejudice, the petitioner must show a reasonable probability that but for counsel's errors the result of the proceeding would have been different. Id.

When raised on collateral review, ineffective assistance claims generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. Id. at 193-95. In alleging ineffective assistance of appellate counsel, Overstreet makes two claims: (a) counsel rendered ineffective assistance for failing to raise a claim of error based upon the United States Supreme Court's holding in Espinosa v. Florida, 505 U.S. 1079 (1992) and (b) appellate counsel failed to challenge trial court error in using Overstreet's mental illness as an aggravating factor rather than a mitigating factor. His first claim falls under the category of failure to present issues well, and his second claim is based upon the waiver of issues category.

25

*A. The Espinosa Claim*

On direct appeal, appellate counsel argued that the jury was allowed to find two overlapping, impermissibly duplicative aggravating circumstances, and therefore the jury considered an inappropriate aggravating circumstance in its weighing process. We disagreed and found that the (b)(1) aggravator (intentional killing during commission of rape) and the (b)(13)(D) aggravator (Eckart was a victim of rape) were not impermissibly duplicative because they were based on different underlying policy considerations. Overstreet, 783 N.E.2d at 1162. We also determined that in its independent evaluation, the trial court correctly refused to weigh either the (b)(13)(D) aggravator or the (b)(13)(C) aggravator (Eckart was a victim of confinement) because the facts supporting them overlapped with the (b)(1) aggravator. Id. at 1167. Overstreet now complains that our determination contravenes the United State Supreme Court's holding in Espinosa and that appellate counsel rendered ineffective assistance in failing to cite or discuss this case on direct appeal.

In Espinosa, the jury was instructed that if the murder in that case was "especially wicked, evil, atrocious or cruel," the jury could consider that fact as an aggravating circumstance in recommending a sentence of death. Espinosa, 505 U.S. at 1080. The jury returned a death sentence recommendation and upon independent evaluation the trial court entered judgment accordingly. Accepting certiorari, the Supreme Court declared that the "wicked, evil, atrocious or cruel" instruction was unconstitutionally vague, and therefore held that the trial court violated the federal Constitution's Eighth Amendment ban on cruel and unusual punishment in imposing a death sentence. Id. at 1081.

Claims of inadequate presentation of certain issues, as contrasted with denial of access to an appeal or waiver of issues, are the most difficult for defendants to advance and reviewing tribunals to support. Bieghler, 690 N.E.2d at 195. And this is so because such claims essentially require the reviewing court to reexamine and take another look at specific issues it has already adjudicated to determine "whether the new record citations, case references, or arguments would have had any marginal effect on their previous decision." Id.

26

Here, as best as we can discern, Overstreet seems to argue that because the (b)(13)(C) and (D) aggravators merged into the (b)(1) aggravator the jury weighed improper aggravators. Thus, the argument continues, "[s]uch weighing contravened the Fifth Amendment protection against double jeopardy, the Eighth Amendment's guarantee of reliability, and the Fourteenth Amendment's due process protections." Br. of Appellant at 67.

We fail to see how Espinosa helps Overstreet's argument. There, the aggravators were held to be improper because they were unconstitutionally vague. No such claim is made here. Had appellate counsel cited or discussed this case on direct review, it would have made no difference in our disposition of Overstreet's appeal.

*B. Mental Illness as an Aggravating Factor*

Overstreet contends that the trial court relied on his mental illness as an aggravating factor rather than a mitigating factor. According to Overstreet, counsel rendered ineffective assistance for failing to raise this issue on direct appeal.

To show that counsel was ineffective for failing to raise an issue on appeal thus resulting in waiver for collateral review, the defendant must overcome the strongest presumption of adequate assistance, and judicial review is highly deferential. Ben-Yisrayl v. State, 738 N.E.2d 253, 260-61 (Ind. 2000). Ineffective assistance is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on appeal. Bieghler, 690 N.E.2d at 193. One reason for this is that the decision of what issues to raise is one of the most important decisions to be made by appellate counsel. Id.

To support his contention that the trial court relied on his mental illness as an aggravating factor, Overstreet directs our attention to the following excerpt from the trial court's sentencing order:

> Defendant did little, if anything, to treat his condition as a young adult and his mother was quite the enabler for his recalcitrant behavior. As an adult, the Defendant did not seek any treatment

27

> until approximately six months before the crimes herein occurred, despite the evaluations and facts which supported the need for therapy and medication.
>
> [T]he evidence also establishes that as Defendant became an adult, he continued to rebuke suggestions for on-going mental health treatment until 1997. In any civilized society there comes a time when adults can no longer blame their actions as adults on what happened to them as children.

Br. of Appellant at 69-70 (quoting Tr. at 1302, 1304).

We first observe, "[M]ental illness at the time of the crime *may be* considered a significant mitigating factor." Castor v. State, 754 N.E.2d 506, 509 (Ind. 2001) (emphasis added) (citing Mayberry v. State, 670 N.E.2d 1262, 1271 (Ind. 1996)). In any event Overstreet's claim lacks merit. The record shows that in its sentencing order the trial court expressly acknowledged, "The defense presented evidence of mitigating circumstances, and the Court has fully and carefully considered the same in determining whether a sentence less than death is more appropriate herein." Tr. at 1294. In a lengthy and detailed recitation, the trial court then chronicled the evidence presented at trial supporting Overstreet's claim of mental illness. Id. at 1297-1302. The trial court acknowledged that "the Court finds the Defendant has shown the Court that he did suffer from an extreme mental disorder," id. at 1301, but concluded that "[d]espite the Defendant's mental condition, the evidence is too extensive for the Court to give a great amount of weight to this as a mitigating factor, but the Court does give low to moderate weight to it as a mitigating factor." Id. at 1303.

Far from considering Overstreet's mental illness as an aggravating factor, as Overstreet erroneously contends, the trial court specifically found Overstreet's mental illness as a mitigating factor. The portion of the sentencing order to which Overstreet directs our attention merely serves as a partial explanation of the trial court's reasoning for assigning it low to moderate weight. Appellate counsel cannot be faulted for failing to raise what would have been a meritless claim.

28

# V.

## Denial of a Fair Post-Conviction Hearing

Overstreet complains that he was denied a fair post-conviction hearing. He alleges: (a) the post-conviction court erred in the admission and exclusion of evidence; (b) the post-conviction court erred in quashing a subpoena to the Johnson County Prosecutor; and (c) an inaccurate post-conviction hearing transcript denies him a fair appellate review of the post-conviction proceedings.

### A.      *The Admission and Exclusion of Evidence*

Under this general heading, Overstreet makes three claims: (1) the post-conviction court erred in sustaining the State's objection to the admission of demonstrative evidence; (2) the post-conviction court erred in sustaining the State's objection to the admission into evidence an affidavit of a defense witness; and (3) the post-conviction court erred in allowing a State's rebuttal witness.

### *(1)      Demonstrative Evidence*

At the post-conviction hearing Overstreet presented four mental health experts that testified about various aspects of his mental illness. During the testimony of one of the experts, Overstreet sought to introduce as a demonstrative exhibit excerpts from a motion picture about the life of a person diagnosed with schizophrenia. Overstreet argued that the excerpts would be "of assistance to the Court in terms of showing how the . . . hallucinations and delusion symptoms work on a schizophrenic." P-Cr. at 532. The post-conviction court sustained the State's objection to the introduction of the exhibit. "Demonstrative evidence is evidence offered for purposes of illustration and clarification." Wise v. State, 719 N.E.2d 1192, 1196 (Ind. 1999). To be admissible, the evidence must be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact. Id. By granting the State's motion the post-conviction court apparently concluded that excerpts from the motion picture would be of no help in illustrating or clarifying the witness' testimony. The record shows that the post-conviction

court listened to hours of testimony and reviewed several documents detailing Overstreet's mental illness. We find no abuse of discretion in the court declining to allow into evidence a fictional story, albeit based on a true-life event that at most would have amounted to cumulative evidence.

### (2) Admission of Affidavit

During hearings on August 16 and August 20, 2004, Overstreet sought to introduce into evidence the affidavits of three expert witnesses, one of which was Dr. Eric Engum's. The post-conviction court sustained the State's objection to the admission of these affidavits, but "allowed the Petitioner one additional day of trial on September 13, 2004, in which to present these experts for testimony and cross-examination." App. at 301. At the September 13 hearing defense counsel informed the court that Dr. Engum was not available, would not be available until October, and requested the court to "give us another day in October and try and get Dr. Engum here to testify." P-Cr. at 839-40. The post-conviction court declined to delay the proceedings any further and also declined to reconsider its ruling on the affidavit. Id. at 840.

Complaining that despite their best efforts counsel could not secure Dr. Engum by the date of the continued hearing, Overstreet argues that, "[g]iven the relevance" of the information contained in the affidavit, "the PCR judge abused its discretion in rejecting the affidavit." Br. of Appellant at 89.[12] First, the problem with the affidavit is not one of relevance, but the ability of the State to question and cross-examine the affiant. See Shumaker v. State, 523 N.E.2d 1381, 1382 (Ind. 1988) (noting that the proffered affidavit was hearsay and improperly admitted because it was an out-of-court statement offered to prove the truth of the matters asserted therein and not susceptible to cross-examination). Indeed, affording the State an opportunity to cross-examine Dr. Engum, as well as other witnesses whose testimony Overstreet sought to present by way of affidavit, prompted the post-conviction court to sustain the State's objection in the first place. Second, Overstreet had nearly a month to make alternative arrangements to secure the testimony of Dr. Engum and apparently failed to do so. Third, and perhaps most important, the

---

[12] Dr. Engum's affidavit provided in pertinent part that if he had been provided with certain information, he would have diagnosed Overstreet with schizophrenia as well as schizotypal personality disorder. App. at 730.

critical point of Dr. Engum's affidavit – that he also would have diagnosed Overstreet as schizophrenic – was not only cumulative, but would have made no difference in the penalty phase of trial. As we discussed earlier in Part III. A, Dr. Smith testified at the post-conviction hearing that he diagnosed Overstreet as suffering from schizophrenia. And the jury heard extensive testimony from Dr. Engum about the seriousness of Overstreet's mental illness. In sum, the post-conviction court did not abuse its discretion in failing to allow Engum's affidavit into evidence.

### (3)    State's Rebuttal Witness

Overstreet also complains about the post-conviction court's decision to allow the State to call a rebuttal witness. The scope of rebuttal evidence lies within the post-conviction court's discretion. Brown v. State, 577 N.E.2d 221, 232 (Ind. 1991). As we mentioned earlier, during the post-conviction hearing Overstreet presented four mental health experts that testified about various aspects of his mental illness. After Overstreet had concluded his presentation, the State called Dr. Ned Masbaum, a forensic psychiatrist, to give "his opinions regarding the reports that have been offered by these experts." P-Cr. at 840. Overstreet objected and complained that allowing Dr. Masbaum to testify was not consistent with the court's case management schedule and Dr. Masbaum's testimony was unnecessary because he could only rebut the testimony of Dr. Engum who did not testify. After a lengthy discussion and argument by both sides, the post-conviction court overruled Overstreet's objection.

Among other things, Dr. Masbaum testified that the trial court appointed him in 1998 to evaluate Overstreet for an opinion regarding his competence to stand trial and his sanity at the time of the offense. Dr. Masbaum's clinical diagnosis at that time was that Overstreet had a history of alcohol dependence. He concluded that Overstreet had sufficient comprehension to understand the proceedings and to assist his attorneys in his defense. Dr. Masbaum also opined that Overstreet was of sound mind at the time of the offenses and that he was able to appreciate the wrongfulness of his conduct. Noting that he had reviewed the reports of various defense experts, including reports making the diagnosis of paranoid schizophrenia, Dr. Masbaum testified that "[Overstreet] had no schizophrenia when I examined him." Id. at 896. He also

31

testified that he stood by that conclusion despite the additional records he had reviewed in preparation for the hearing. Id. Overstreet vigorously cross-examined Dr. Masbaum, challenging his assumptions and pointing out that Dr. Masbaum did not review the post-conviction testimony of Overstreet's experts. Id. at 905-13.

On appeal Overstreet has not explained how he was harmed by the post-conviction court's decision to allow Dr. Masbaum to testify. Overstreet complains that he was "caught by surprise." Br. of Appellant at 90. But the thoroughness of Overstreet's cross-examination reveals that he was well prepared to meet any challenge posed by the testimony of this witness. We find no abuse of discretion here.

### B. *Sustaining Motion to Quash Subpoena*

During the post-conviction proceedings Overstreet served a subpoena on the prosecutor of Johnson County directing him to appear in court for questioning. Overstreet sought to explore a broad range of topics, including decisions the prosecutor made during trial as well as the prosecutor's investigation of Scott Overstreet's involvement in the death of Kelly Eckart.[13] On motion by the Attorney General, the post-conviction court entered an order quashing the subpoena. Overstreet complains the court erred.

This Court has held:

> As a general rule, a prosecuting attorney cannot be called as a defense witness unless the testimony sought is required by compelling and legitimate need. The trial court in its discretion may deny the request if the prosecutor does not have information vital to the case. Where the evidence is easily available from other

---

[13] More specifically Overstreet sought to pursue the following: "[k]nowing presentation of false testimony, [a]buse of the grand jury process, [i]nterference with the defense investigation, [i]mproper focus on Overstreet as a suspect, [s]uppression of material evidence, [i]njection of inadmissible victim impact evidence, [f]ailure to pursue other suspects, [e]ngagement in a pattern of misconduct, [p]ossible participation in causing Overstreet to appear before the jury in shackles, [w]ithholding information about benefits extended to a key witness, and [e]liciting prejudicial, inadmissible, and misleading evidence." App. at 155. According to Overstreet, "As to these areas, Hamner [the Johnson County Prosecutor] is the appropriate witness. As trial prosecutor, he presumably has first-hand knowledge of these matters." Id.

> sources and absent "extraordinary circumstances" or "compelling reasons," an attorney who participates in a case should not be called as a witness.

Ingle v. State, 746 N.E.2d 927, 933 (Ind. 2001) (quotation omitted) (finding there was no basis to conclude that prosecutor had any information that was not easily available from other sources); see also Badelle v. State, 754 N.E.2d 510, 536 (Ind. Ct. App. 2001) (finding the defendant established a compelling and legitimate need for some of the information requested from former prosecutor, but the need was met by former prosecutor's affidavit and the testimony of a deputy prosecutor), trans. denied, 761 N.E.2d 423 (Ind. 2001).

Citing Ingle and Badelle, the post-conviction court determined that although Overstreet "may have a compelling need for the information sought, [he] has failed to show that the information is not available from other sources or by other means." App. at 167. In this appeal Overstreet still makes no attempt to demonstrate that the information he sought is not easily available from other sources. Instead he contends Ingle is not relevant and that Badelle is distinguishable on its facts. Br. of Appellant at 91-92. We agree with the post-conviction court. Overstreet's failure to show that the information he requested is not easily available from other sources is fatal to his claim.

### C. Inaccurate Post-Conviction Transcript

After the post-conviction court entered its order denying Overstreet relief, he thereafter filed a motion to correct and supplement the transcript of the post-conviction proceedings. Attached to his motion was an eighteen-page errata sheet, based on Overstreet's review of audio discs, listing suggested corrections of misspelled words and transcriptions of testimony the court reporter found inaudible. App. at 585-605. Overstreet requested that the transcript be corrected consistent with his errata sheet and that a corrected transcript be submitted as a supplemental transcript in accordance with the Indiana Appellate Rules.[14] The State responded arguing that although Overstreet for the most part correctly identified typographical, grammatical, or spelling

---

[14] Indiana Appellate Rule 31(A) provides in pertinent part: "If no Transcript of all or part of the evidence is available, a party or the party's attorney may prepare a verified statement of the evidence from the best available sources, which may include the party's or the attorney's recollection."

errors, Overstreet failed to show that these inaccuracies were material. The post-conviction court denied Overstreet's motion.

Overstreet complains that the post-conviction court's ruling violated his right to a fair opportunity to pursue his claims.[15] Br. of Appellant at 94. In support Overstreet relies in part on Ben-Yisrayl v. Davis, 277 F.Supp. 2d 898, 905 (N.D. Ind. 2003), where the district court granted habeas corpus relief to a petitioner in part because of inaccuracies in the transcript of petitioner's capital trial. On appeal to the circuit court, Judge Manion observed, "[T]his faulty record does not provide the foundation necessary to render due process to the defendant in this appeal." Ben-Yisrayl v. Davis, 431 F.3d 1043, 1054 (7th Cir. 2005) (Manion, J., concurring).

Ben-Yisrayl provides Overstreet no relief. At stake in that case was the accuracy and reliability of the *trial* record.[16] See Gardner v. Florida, 430 U.S. 349, 361 (1977) ("[I]t is important that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed."); see also Dobbs v. Zant, 506 U.S. 357, 358 (1993) (per curiam) ("We have emphasized before the importance of reviewing capital sentences on a complete record."). Importantly, the district court in Ben-Yisrayl determined that the record, in particular a transcript of comments the State made during closing argument, contained too many errors and uncertainties to enable the court to explore fully the existence and extent of any constitutional error. Ben-Yisrayl, 277 F.Supp. 2d at 906.

In this case the errors in the transcript are inconsequential.[17] Significantly, our review of Overstreet's post-conviction claims has not been impeded by inaccuracies in the transcript.

---

[15] We note that Overstreet has not provided this Court with the audio discs that he contends are an accurate reflection of the post-conviction hearing. Rather he invites us to "if necessary, order the audio version submitted to resolve any disputes about what was said." Br. of Appellant at 94. As explained more fully we do not find it necessary to order the audio discs and thus decline Overstreet's invitation.

[16] Indeed Ben-Yisrayl "argue[d] vigorously that errors and omissions in the record entitle[d] him to a new trial." Ben-Yisrayl v. State, 753 N.E.2d 649, 658 (Ind. 2001).

[17] For example, the transcript records some words as "INAUDIBLE," but apparently the actual words can be discerned from the audio discs. In other instances witness responses are, according to Overstreet, inaccurately transcribed, for example, "it's a form, a line" instead of "It's a form of lying." App. at 596.

Many errors listed are in portions of the proceedings that are not germane to the issues Overstreet has raised for review. And just as important, Overstreet makes no claim that he has been harmed in any way by the inaccuracies. For example, Overstreet does not contend that his presentation of the issues in this appeal have been in any way affected by the post-conviction transcript's deficiencies, and Overstreet does not contend that his ability to advance a claim has in any way been adversely affected by the transcript's deficiencies. We find no error.

## VI.

## Mental Illness and Competency to be Executed

Overstreet contends that his death sentence "should be prohibited under the United States and Indiana Constitutions" because he is "a severely mentally ill man." Br. of Appellant at 73.

### A.    *Federal Constitutional Claim*

The Supreme Court has made clear that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." Ford v. Wainwright, 477 U.S. 399, 410 (1986). What is less clear however is who falls within the Eighth Amendment's embrace. The Court did not define insanity, instead leaving to the states "the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." Id. at 416-17 (plurality opinion). In a concurring opinion Justice Powell declared that the Eighth Amendment "forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." Id. at 422 (Powell, J., concurring). More recently, in Panetti v. Quarterman, 127 S. Ct. 2842 (2007) the Supreme Court again declined to "attempt to set down a rule governing all competency determinations." Id. at 2862. However, the Court departed from the Justice Powell formulation and expanded upon the Eighth Amendment's reach

---

And there are a number of spelling and punctuation errors. See, e.g., id. at 590 ("Borgess" instead of "Borges"); id. at 605 ("Hailes'" instead of "Haile's").

for persons with mental illness.[18] It held that the lower court should have considered Panetti's submission that he "suffers from a severe, documented mental illness that is the source of gross delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced." Id. (rejecting the argument that a prisoner's awareness of the State's rationale for an execution is the same as a rational understanding of it). The Court noted that the goal of retribution is served only when the prisoner can recognize "the severity of the offense and the objective of community vindication." Id. at 2861. This goal is called into question when the prisoner suffers from a form of mental illness that distorts his or her mental state to the point that the prisoner's "awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." Id.

As we read Panetti, a prisoner is not competent to be executed within the meaning of the Eighth Amendment if (1) he or she suffers from a severe, documented mental illness; (2) the mental illness is the source of gross delusions; and (3) those gross delusions place the "link between a crime and its punishment in a context so far removed from reality" that it prevents the prisoner from "comprehending the meaning and purpose of the punishment to which he [or she] has been sentenced." Id. at 2862.

In this case, there is no doubt that Overstreet suffers from severe, documented mental illness. The record shows that three mental health professionals examined Overstreet shortly before his trial in 2000. Dr. Eric Engum diagnosed Overstreet with schizotypal personality disorder, Tr. at 5078-79, Dr. Robert Smith diagnosed Overstreet with alcohol dependence and schizoaffective disorder, P-Cr. at 510, and Dr. Philip Coons diagnosed alcohol abuse, schizotypal personality disorder and dissociative disorder not otherwise specified. Id. at 442. In 2004, in preparation for the post-conviction hearing, both Dr. Smith and Dr. Coons re-evaluated Overstreet. Dr. Smith concluded that Overstreet was now schizophrenic, stating, "It's been documented for basically now over twenty years that [Overstreet] has a severe psychiatric illness that has grown progressively worse over time." Id. at 524. Dr. Coons diagnosed Overstreet with schizophrenia – paranoid type – as a principal diagnosis, along with dissociative disorder not

[18] Prior to Panetti, "Federal and state courts generally agree[d] that Justice Powell's concurring opinion [set] forth the applicable constitutional standard." Amaya-Ruiz v. Stewart, 136 F.Supp. 2d 1014, 1021 (D. Ariz. 2001) (citing cases).

36

otherwise specified, and a history of alcohol abuse. App. at 703. Also in advance of the post-conviction hearing, Dr. Edmond Charles Haskins, a clinical neuropsychologist, diagnosed Overstreet with paranoid schizophrenia, which the doctor agreed, "reflects an extreme mental and emotional disturbance." P-Cr. at 612. Further, Dr. Smith, Dr. Haskins, and Dr. Coons all testified that Overstreet was not malingering. Id. at 453, 523, 603.

The evidence presented to the post-conviction court demonstrates that Overstreet's mental illness manifests itself in a variety of ways including "hallucinations and delusions" which are associated with believing that demons and angels talk to him and tell him what to do. P-Cr. at 519, 599-600. "He again acknowledged that his doctors have tried to tell him that the devils and demons are not real but he maintained that 'they do not know the truth.' He explained that devils and demons have special powers and that they can disguise themselves as corrections officers, visitors, etc." App. at 686. Overstreet described several incidents of these paranoid delusions where he believed that the demons imitated his sister, his mother, his ex-wife, and prison guards. Id. at 673. Additionally he believes that bad things reported on television, his wife's asthma, and other accidents and injuries to his family members are caused by him slipping into negative thoughts. Id. at 672, 687. He discussed with Dr. Smith several experiences where he is uncertain if they were real or not. For example, "[a]t one time, Mr. Overstreet believed that his ex-wife was hired at the Pendleton Correctional Facility and was harassing him by calling his name at night and during the day." Id. at 673. Overstreet has a long history of dissociative disorders including: depersonalization (out-of-body experiences), derealization (feelings of unreality), amnesia, fugue (amnesia plus wandering), and feeling split into different personality states. Id. at 706.

It is clear that Overstreet suffers from a severe, documented mental illness and that the mental illness is a psychotic disorder that is the source of gross delusions. However, fatal to Overstreet's federal constitutional claim is that there was no evidence presented to the post-conviction court one way or the other on whether Overstreet is aware of the punishment he is about to suffer and why he is to suffer it – the Ford standard as articulated by Justice Powell. Nor was there any evidence presented to the post-conviction court one way or the other on whether Overstreet's psychotic delusions "prevent[ ] him from comprehending the meaning and

purpose of the punishment to which he has been sentenced." Panetti, 128 S. Ct. at 2862. Indeed the scant evidence bearing on this question includes Overstreet's statement that "[E]veryone tells me that I did it, but I cannot believe them." App. at 687. There was also evidence that Overstreet related that he sometimes has bad thoughts that his brother committed the offense, but his communication becomes vague and circular in reasoning, repeating over and over that he needs to have positive thoughts because his negative thoughts would otherwise result in harm to his family. Id. The record shows that although Overstreet continues to struggle with discerning "what is 'real,'" there is no evidence that indicates he questions the reality of the crime occurring or the reality of his punishment by the State for the crime committed. Id. at 689. Thus, even under Panetti's more nuanced articulation of the Ford insanity test, Overstreet does not qualify as insane under current Eighth Amendment jurisprudence. In sum, Overstreet is entitled to no relief on his federal constitutional claim.

### B. State Constitutional Claim

According to the majority Overstreet also is entitled to no relief on his state constitutional claim. This view is expressed in the separate opinions of Chief Justice Shepard (joined by Sullivan), Justice Dickson, and Justice Boehm. I respectfully disagree.

Article I, Section 16 of the Indiana Constitution provides, "Excessive bail shall not be required. Excessive fines shall not be imposed. Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense."

The United States Constitution establishes a minimum level of protection to citizens of all states. See Oregon v. Hass, 420 U.S. 714, 719 (1975). But a state is free as a matter of its own constitutional law to confer rights above the floor of constitutional safeguards found in the United States Constitution. See, e.g., Pruneyard Shopping Ctr. v. Robins, 447 U.S. 74, 81 (1980); Cooper v. California, 386 U.S. 58, 62 (1967). As Justice Brennan wrote:

> [T]he decisions of the [United States Supreme] Court are not, and
> should not be, dispositive of questions regarding rights guaranteed
> by counterpart provisions of state law. Accordingly, such

38

decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them. Rather, state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees.

William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 502 (1977) (footnote omitted). This Court has explained on more than one occasion that when examining constitutional issues, claims based upon the Indiana Constitution should be analyzed separately from claims based upon its federal constitutional counterparts. See Boehm v. Town of St. John, 675 N.E.2d 318, 321 (Ind. 1996); Collins v. Day, 644 N.E.2d 72, 75 (Ind. 1994); see also Randall T. Shepard, Second Wind for the Indiana Bill of Rights, 22 Ind. L. Rev. 575 (1989). I agree with this proposition. And in this area of jurisprudence in particular, I continue to believe that "Indiana's constitution affords even greater protection than its federal counterpart." Corcoran v. State, 774 N.E.2d 495, 503 (Ind. 2002) (Rucker, J., dissenting) (expressing the belief that a sentence of death for a person suffering from severe mental illness violates the Cruel and Unusual Punishment provision of the Indiana Constitution).

In this case, precedent from the United States Supreme Court, albeit in a slightly different context, informs my view on the question of whether certain mentally ill prisoners should be excluded from execution. In Atkins v. Virginia, 536 U.S. 304 (2002), the Court held that executions of the mentally retarded violated the Eighth Amendment. Importantly the Court declared that the basis for this prohibition is the mentally retarded person's "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 318. Of course, Indiana's statutory prohibition on executing the mentally retarded predates Atkins by eight years. I.C. § 35-36-2-5(e) (1997 Supp.).[19] And there

---

[19] Indiana Code section 35-36-2-5(e) (1997 Supp.) provides in relevant part: "If a court determines under IC 35-36-9 that a defendant who is charged with a murder for which the state seeks a death sentence is a mentally retarded individual, the court shall sentence the defendant under IC § 35-50-2-3(a)," which provides for a term of years.

is no claim in this case that Overstreet is mentally retarded. But the logic and underlying rationale of <u>Atkins</u> applies with equal force here. <u>See</u> <u>Corcoran</u>, 774 N.E.2d at 502 (The "underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill.") (Rucker, J., dissenting). That is to say, if a person who is mentally ill suffers from the same "diminished capacities" as a person who is mentally retarded, then logic dictates it would be equally offensive to the prohibition against cruel and unusual punishment to execute that mentally ill person.

As recounted in detail above, Overstreet suffers from "a severe psychiatric illness that has grown progressively worse over time." P-Cr. at 524. He exhibits diminished capacities to understand and process information. Overstreet's mental illness is also reflected in his "confused and disorganized thinking." <u>Id.</u> at 523. His communication often becomes vague and circular in reasoning. App. at 687. He does not understand the reaction of others who try to tell him his hallucinations are not real. <u>Id.</u> at 686 ("He again acknowledged that his doctors have tried to tell him that the devils and demons are not real but he maintained that 'they do not know the truth.'").

Punishment is cruel and unusual under Article I, Section 16 if it "makes no measurable contribution to acceptable goals of punishment, but rather constitutes only purposeless and needless imposition of pain and suffering." <u>Dunlop v. State</u>, 724 N.E.2d 592, 597 (Ind. 2000) (quotation omitted). Because I see no principled distinction between the diminished capacities exhibited by Overstreet and the diminished capacities that exempt the mentally retarded from execution, I would declare that executing Overstreet constitutes purposeless and needless imposition of pain and suffering thereby violating the Cruel and Unusual Punishment provision of the Indiana Constitution. Therefore, I would remand this cause to the post-conviction court with instructions to impose a sentence of life imprisonment without parole. In all other respects, I would affirm the judgment of the post-conviction court.

**Conclusion**

The judgment of the post-conviction court is affirmed.

40

Shepard, C.J., and Dickson, Sullivan, and Boehm, JJ., concur except as to part VI. B, and vote to affirm the judgment of the post-conviction court.

As to part VI. B, Shepard, C.J. delivers an opinion in which Sullivan, J. concurs and Dickson, J., and Boehm, J., deliver separate opinions.

**Shepard, C.J., as to the State Constitutional Claim.**

All five Justices join Justice Rucker's opinion as to the resolution of Overstreet's various claims, except as to Part VI. B.

Part VI. B covers Overstreet's contention that his mental illness renders him ineligible for the death penalty, citing Article I, Section 16 of the Indiana Constitution. This claim under Section 16 has already been decided adversely to his position. Matheney v. State, 833 N.E.2d 454, 457 (Ind. 2005); Baird v. State, 831 N.E.2d 109, 111 (Ind. 2005). Thus, the post-conviction court is being affirmed in all respects.

Sullivan, J., concurs.

**Dickson, Justice.**

I concur with Justice Rucker's opinion with the exception of Part VI. B, which addresses Overstreet's state constitutional claim. As to this issue, I agree with Justice Boehm that Matheney v. State, 833 N.E.2d 454, 456 (Ind. 2005), and Baird v. State, 831 N.E.2d 109, 115 (Ind. 2005), both focused on a claim of mental illness at the time of the crime, rather than a claim of subsequent or enhanced mental illness. But, although Overstreet may claim that the severity of his mental illness has increased over time, this assertion does not result in a violation of the Indiana Constitution.

While both the federal Constitution's Eighth Amendment and Article 1, Section 16 of our 1851 Indiana Constitution prohibit the infliction of "cruel and unusual punishments," I cannot agree that the subsequent interpretation and application of Indiana's Section 16 necessarily follow in precise lock step with the ascendant federal formulation of Eighth Amendment jurisprudence. In this, I agree with Justice Rucker that claims based upon the Indiana Constitution should be analyzed separately from those based upon its federal constitutional counterparts. But in contrast to Justice Rucker's conclusion, I consider the Indiana Constitution to provide *different*, rather than necessarily *more*, protection than the federal Eighth Amendment for persons with mental illness facing the death penalty.

Justice Boehm notes federal decisions that, in the past fifty years, have interpreted the prohibition of cruel and inhuman punishment, calling for consideration of "evolving standards of decency." Roper v. Simmons, 543 U.S. 551, 560-561, 125 S. Ct. 1183, 1190, 161 L.Ed.2d 1, 16 (2005); Trop v. Dulles, 356 U.S. 86, 100-01, 78 S. Ct. 590, 598, 2 L.Ed.2d 630, 642, (1958); *cf.* Atkins v. Virginia, 536 U.S. 304, 311-13, 122 S. Ct. 2242, 2246-48, 153 L.Ed.2d 335, 343-46, (2002) (considering a national consensus of the standards of decency); Ford v. Wainwright, 477 U.S. 399, 406, 106 S. Ct. 2595, 2600, 91 L.Ed.2d 335, 344 (1986) (taking into account "contemporary values"). Consideration of factors such as "national consensus" and "standards of decency," however, are not necessarily required when construing Indiana's Section 16.

The text "cruel and unusual punishment" in Section 16, like the phrase "unreasonable search and seizure" in Section 11 of Article 1, strongly suggests that our framers and ratifiers intended and foresaw that these provisions would be understood and applied in light of the circumstances existing and values prevailing in Indiana at relevant future times. When considering that the Indiana General Assembly has relatively recently spoken with legislative enactments defining the limited class of defendants eligible for the death penalty,[1] prohibiting the death penalty for mentally retarded individuals but not for persons with mental illness,[2] and defining "mentally ill" and "mentally retarded" for purposes of criminal procedure and sentencing,[3] a sentence of death for a person not mentally retarded but suffering mental illness cannot be considered "cruel" or "unusual" under Section 16 in light of the clearly prevailing values in our state. For these reasons, Overstreet does not prevail in the claim that his death sentence violates the Indiana Constitution.

---

[1] Ind. Code § 35-50-2-9 (last amended in 2007).

[2] Ind Code § 35-36-2-5 (last amended in 2007), and Ind. Code § 35-50-2-9(a) (last amended in 2007).

[3] Ind. Code § 35-36-1-1 (1981) (definitions of "insanity" and "mentally ill"), Ind. Code §35-36-9-2 (last amended in 2007) (definition of "mentally retarded individual").

Boehm, Justice, concurring, and concurring in result as to Part VI. B

I concur in all parts of Justice Rucker's opinion except for Part VI. B.  For the reasons explained below, I concur in the result reached in the separate opinions of Chief Justice Shepard and Justice Dickson.

I do not agree with the Chief Justice that prior decisions of this court have foreclosed Overstreet's current claim that his execution would constitute cruel and unusual punishment in violation of Article I, Section 16 of the Indiana Constitution.  Specifically, neither of the cases cited by Chief Justice Shepard's separate opinion as to Part VI.B of the majority opinion addressed a claim that the current mental state of the petitioner rendered the petitioner ineligible for execution.  Rather, Matheney v. State stated Matheney's claim under the Indiana Constitution as that he "should be exempt from the death penalty because he was mentally ill when he committed the murder."  833 N.E.2d 454, 456 (Ind. 2005).  Baird v. State was explicit in declining to rule on the issue Overstreet seeks to raise: "we do not discern a claim that Baird is presently not competent to be executed . . . ."  831 N.E.2d 109, 115 (Ind. 2005).  Moreover, neither case addressed anything more than the specific record proof, or lack thereof, of the petitioner's mental state.

I agree, however, that the Indiana Constitution affords no greater protection than the Eighth Amendment provides on this issue.  The text of the Indiana Constitution on this point is identical to the Eighth Amendment, and there is nothing in the history or judicial precedents of this state, or our constitutional debates, that leads me to conclude that the texts should be interpreted differently.  The Eighth Amendment prohibition against the execution of the insane rests significantly on evolving national standards of decency.[1]  I cannot conclude that the culture

---

[1] See Ford v. Wainwright, 477 U.S. 399, 406 (1986) ("In addition to considering the barbarous methods generally outlawed in the 18th century, therefore, this Court takes into account objective evidence of contemporary values before determining whether a particular punishment comports with the fundamental human dignity that the [Eighth] Amendment protects."); cf. Roper v. Simmons, 543 U.S. 551, 560-61 (2005) (holding that the Court must refer to "'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual" (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion))); Atkins v. Virginia, 536 U.S. 304, 311-13 (2002) (holding that the determination of constitutionality under the Eighth Amendment includes both a

of Indiana is materially different in this respect from the national consensus the Supreme Court of the United States has found.

In the past few years, the Supreme Court has held that the federal Constitution prohibits the execution of both juveniles and the mentally retarded. See Roper v. Simmons, 543 U.S. 551, 567-68 (2005); Atkins v. Virginia, 536 U.S. 304, 321 (2002). No such categorical prohibition has been placed on the execution of the mentally ill, even those whose disease is severe. Rather, the Constitution has been held to prohibit only the execution of those who meet the standards set by Ford and Panetti. Although I can certainly understand why the legislature might choose to prohibit the execution of all persons suffering from severe mental illness, that has not occurred in this state, and I cannot read Article I, Section 16 more expansively than the Eighth Amendment. Accordingly, I concur in the result reached by Chief Justice Shepard as to Part VI.B.

---

national consensus of the standards of decency as well as the Court's judgment of that consensus).