## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2020, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jacob I. Stidham,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee*

June 23, 2020

Court of Appeals Case No.
19A-PC-2702

Appeal from the Tippecanoe
Circuit Court

The Honorable Sean M. Persin

Trial Court Cause No.
79C01-1608-PC-32

**Altice, Judge.**

# Case Summary

[1] Jacob I. Stidham appeals from the denial of his petition for post-conviction relief (PCR). On appeal, he asserts that the post-conviction court erred in rejecting his claim of ineffective assistance of trial counsel.

[2] We affirm.

# Facts & Procedural History

[3] The facts as set out on direct appeal follow:

> On March 5, 2011, R.M. and A.T. were in the Chauncey Hill area in Lafayette to celebrate a friend's birthday. After drinking at some bars and eating at a fast food restaurant, R.M. began calling for a taxi cab on her cell phone to take her and A.T. back to where they were staying.
>
> At approximately 3:30 a.m., while R.M. and A.T. were waiting for the cab, Stidham pulled up in a white SUV. R.M. assumed that Stidham was the driver from the taxi cab company. Both girls entered the SUV and R.M. noticed that A.T. had "passed out" in the back of Stidham's vehicle. At some point, Stidham stopped the vehicle and ordered R.M. to perform fellatio on him. When R.M. refused, Stidham grabbed R.M.'s head and pulled her close to him.
>
> R.M. escaped Stidham's grasp, called 911, and told the dispatcher that her friend had "passed out" in the back of Stidham's vehicle. While R.M. was talking with the dispatcher, Stidham removed R.M.'s seatbelt, opened the passenger side door, and shoved her out of the vehicle. Stidham then sped away with A.T. still in the back seat.

R.M. then ran to a nearby residence, where she again called 911 and attempted to call A.T.'s cell phone. The police were unable to find Stidham's vehicle in light of the description that R.M. had given them.

At approximately 6:29 a.m., A.T. staggered into a Speedway Gas Station (Speedway) on Old U.S. 231 South in Lafayette. A.T. was missing her coat and purse, so she used the gas station's telephone to contact her family. A.T. noticed that her bra was unhooked and was experiencing soreness in her vaginal area.

Detective Travis Dowell of the Tippecanoe County Sheriff's Department arrived at the Speedway and observed that A.T. was cold, upset, and crying. A.T. was transported to the hospital where Shannon Luper, a certified Sexual Assault Nurse Examiner, performed a rape test on A.T. and recovered a quantity of DNA from A.T.'s right buttock. Luper also found white secretion and several red abrasions in A.T.'s vagina, and some bruises on A.T.'s right knee and forearms.

The police subsequently tested the DNA and found Stidham's DNA on record that matched that which was recovered from A.T. Thereafter, on June 21, 2011, police officers obtained a search warrant that authorized them to obtain a DNA exemplar from Stidham. The DNA matched that which was recovered near A.T.'s right buttock. The police also executed a search warrant for Stidham's apartment, where A.T.'s digital camera was discovered. The camera revealed digital photos of A.T.'s activities on the night of the assault.

Stidham was arrested, and shortly thereafter, he called a friend, Benita Allen, and asked her to move a blue container from another apartment where he occasionally resided. Stidham also requested that Allen not tell the police where he lived. However, following Stidham's arrest and release on bond, the police

learned about the other residence. Thus, they obtained a search warrant for this residence and discovered a newspaper article about the assault on R.M. and A.T. The officers also found several articles of female clothing in a tub.

\*\*\*

Several days after Stidham had attacked R.M. and raped A.T., Stidham told a friend, Beau Kerkhoff, what he had done to A.T. and R.M. During that conversation, Stidham admitted having sexual intercourse with one of the women.

\*\*\*

R.M. testified that in the early morning of March 6, 2011, she made approximately five calls for a taxi-cab to take her and A.T. home from a restaurant in Lafayette. R.M. also described A.T.'s state of intoxication that morning, explaining that "she was definitely impaired. She was not walking straight.... I did not feel that she was capable of making a decision."

A.T. testified that she remembered drinking alcohol that evening, but had no recollection of the events after her fourth or fifth drink. A.T. testified that she only remembered going to the first bar after dinner, that she did not remember leaving, did not recall going to other bars or the restaurant, and did not remember entering Stidham's vehicle. A.T. testified that the next thing she remembered was waking up outside the Speedway and not knowing where she was.

A.T. also denied that she gave Stidham permission to have her camera, did not have consensual sexual intercourse with Stidham, and testified that she was unaware that Stidham had sexual intercourse with her. Luper, the sexual assault nurse who

examined her, testified that A.T. sustained vaginal injuries, and that the injuries were most likely sustained during nonconsensual sexual intercourse.

Kerkhoff testified about the conversation that he had with Stidham a short time after the attacks where Stidham mentioned that he had picked up two women from a bar, had dropped one of them off, and had sexual intercourse with the other.

The State introduced evidence of Stidham's cell phone records that placed him in the area where the attacks occurred on March 6, 2011, between 12:55 a.m. and 3:00 a.m., leaving the Lafayette area at 5:11 a.m., and being near the intersection of U.S. 231 and U.S. 52 near Otterbein at 5:20 a.m.

R.M.'s cell phone records placed her in the same area until 3:00 a.m. on March 6 and in an area near U.S. 31 after 3:00 a.m. Her records also indicated that she had called a taxi company at least four times that evening. A.T.'s cell phone records placed her in the Chauncey Village area until approximately 3:00 a.m., at which point the calls that were made to her were forwarded to her voicemail.

Stidham testified that he had a consensual sexual encounter in his Jeep with a woman he had met outside of Harry's bar. Stidham claimed that the woman performed fellatio and that he ejaculated on her hand. Stidham also claimed that the woman had left her camera with him. Stidham then alleged that he did not have any further contact with the woman that evening.

During closing arguments, Stidham alleged that he was not the individual who picked up R.M. and A.T. Stidham further claimed that he had not committed confinement because R.M. and A.T. had voluntarily entered the vehicle. Finally, Stidham alleged that he did not commit rape because he did not have

sexual intercourse with A.T. Rather, Stidham claimed that in light of A.T.'s "flirtatious behavior" that evening, she likely had sex with someone other than him.

*Stidham v. State*, 79A02-1211-CR-939, slip op. at 1-4 (Ind. Ct. App. Dec. 31, 2013) (record citations omitted).

[4] On August 10, 2011, the State charged Stidham with numerous offenses against both A.T. and R.M., including confinement, receiving stolen property, public indecency, and attempted deviate conduct.[1] The State was permitted, over Stidham's objection, to add a charge of rape days before trial. A three-day jury trial commenced on September 25, 2012. During the State's case-in-chief, two detectives testified that when they transported Stidham to the hospital to obtain a DNA sample, Stidham provided no statement and did not ask any questions. In closing, the State referenced Stidham's silence as evidence of his guilt. Stidham's trial counsel did not object to the testimony of the detectives or the State's comments during closing. Also, at trial, the State introduced into evidence A.T.'s camera that was found when police executed a search warrant at a location where Stidham was known to stay. The camera, however, was not specifically identified in the search warrant. Stidham's counsel did not object to admission of evidence relating to the camera.

---

[1] Stidham was charged with additional offenses stemming from a separate, but similar incident. Upon Stidham's motion, these charges were severed and tried separately.

[5] The jury ultimately found Stidham guilty of two counts of criminal confinement, both Class C felonies; public indecency as a Class A misdemeanor; battery as a Class B misdemeanor; and rape as a Class B felony. On October 29, 2012, the trial court sentenced Stidham to an aggregate sentence of twenty-three and a half years in the Department of Correction. On direct appeal, Stidham unsuccessfully challenged the addition of the rape charge and the sufficiency of the evidence regarding his confinement and rape convictions.

[6] Stidham filed a pro se PCR petition on August 29, 2016. On August 15, 2018, Stidham, by counsel, filed an amended PCR petition. In his petition, Stidham alleged he was denied his right to effective assistance of trial counsel under the United States and Indiana Constitutions. The post-conviction court held a hearing on March 20, 2019. During the hearing, Stidham's trial counsel, appellate counsel, and Detectives Dowell and Jacob Amberger testified. Stidham's trial counsel testified that he had been an attorney for over thirty-six years and that he would have objected to commentary on Stidham's right to remain silent if he thought it presented an issue for appeal. He also testified that if he thought there was an issue with the admission of the camera, he would have taken pretrial action and objected at trial. Trial counsel summarized his experience regarding trial strategy and objections:

> As a matter of course, there are usually dozens of things that the defense lawyer could object to but I choose to not to because either it doesn't bear on what's persuasive to the jury or in some cases you have to make a close decision about whether or not

your [sic] going to object and when your [sic] sitting in the trial you know it's like checking down a defense you know you're reading what's going on. So yeah there's reasons sometimes for trial strategy that you don't object.

*Transcript Vol. 2* at 23. On October 21, 2019, the post-conviction court entered its findings of fact, conclusions of law, and order denying Stidham's request for post-conviction relief. Stidham now appeals. Additional facts will be provided as necessary.

# Discussion & Decision

[7] In a post-conviction proceeding, the petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Bethea v. State*, 983 N.E.2d 1134, 1138 (Ind. 2013). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id*. (quoting *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004)). In order to prevail, the petitioner must demonstrate that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite the post-conviction court's conclusion. *Id*. Although we do not defer to a post-conviction court's legal conclusions, we will reverse its findings and judgment only upon a showing of clear error, i.e., "that which leaves us with a definite and firm conviction that a mistake has been made." *Id*. (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

[8] A petitioner will prevail on a claim of ineffective assistance of counsel only upon a showing that counsel's performance fell below an objective standard of

reasonableness and that the deficient performance prejudiced the petitioner. *Bethea*, 983 N.E.2d at 1138. To satisfy the first element, the petitioner must demonstrate deficient performance, which is "representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* (quoting *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002)). To satisfy the second element, the petitioner must show prejudice, which is "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 1139. "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Kubsch v. State*, 934 N.E.2d 1138, 1147 (Ind. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Failure to satisfy either element will cause an ineffectiveness claim to fail. *Carrillo v. State*, 982 N.E.2d 461, 464 (Ind. Ct. App. 2013). Thus, if a petitioner cannot establish prejudice, we need not evaluate the reasonableness of counsel's performance. *Id.*

> There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Stevens v. State*, 770 N.E.2d 739, 746–47 (Ind. 2002) (citations omitted).

[9] We observe that the choice of defense theory is a matter of trial strategy. Overstreet, 877 N.E.2d 144, 154 (Ind. 2007). Counsel is given "significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best." *Potter v. State*, 684 N.E.2d 1127, 1133 (Ind. 1997). "A reviewing court will not second-guess the propriety of trial counsel's tactics." *Davidson v. State*, 763 N.E.2d 441, 446 (Ind. 2002) (citation and quotation marks omitted). "[T]rial strategy is not subject to attack through an ineffective assistance of counsel claim, unless the strategy is so deficient or unreasonable as to fall outside of the objective standard of reasonableness." *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind. 1998). "This is so even when such choices may be subject to criticism or the choice ultimately prove[s] detrimental to the defendant." *Id*. (citation and quotation marks omitted).Stidham argues that the post-conviction court erred in concluding that he was not denied the effective assistance of trial counsel. Stidham maintains that his trial counsel's performance was deficient in two respects—failing to object to testimony and the State's comments during closing argument, which he asserts amounted to *Doyle*[2] violations, and failing to challenge/object to the admission of evidence regarding A.T.'s camera because it was obtained outside the scope of a search warrant. He further argues that he was prejudiced thereby.

---

[2] *Doyle v. Ohio*, 426 U.S. 610 (1976).

[10]    We first consider Stidham's argument regarding alleged *Doyle* violations.  After receiving a search warrant for Stidham's DNA, Detectives Dowell and Amberger of the Tippecanoe County Sheriff's Department went to Stidham's place of employment and picked him up to transport him to the hospital for a blood draw.  At trial, the State questioned Detective Dowell as follows:

> Q      Did you explain to him why you were there?
>
> A      Yeah well we explained to him that we had a warrant for his DNA.
>
> Q      Did he say anything or ask any questions?
>
> A      No.
>
> ***
>
> Q      How did you describe his attitude and demeanor during this time?
>
> A      Pretty mellow.  He wasn't saying anything, like I said never asked us what this was about, never asked us what was going on, just going along with whatever, you know just go along with us.

*Exhibits Vol. 1* at 33.  The State also questioned Detective Amberger:

> Q      Did you tell the defendant, Jacob Stidham that [you had a search warrant for his DNA]?
>
> A      Yes.

Q      Did he ask you any questions about it?

A      No very little was said.

*Exhibits Vol. 2* at 112.  During closing arguments, the State referred to this
testimony:

> And also let's look at the – let's look at the defendant's behavior.
> The behavior during the DNA sample he's approached with a
> search warrant we need a sample of your blood, we need your
> DNA.  Sure he's cooperative does he ask what is going on?
> What are we doing?  What's this about?  No questions.

*Id*. at 175.  Stidham argues that his trial counsel was ineffective because he did
not object, move to strike, or request a curative instruction with regard to the
above responses of the detectives or the State's comments during closing on
grounds of a *Doyle* violation.

Using a defendant's post-Miranda silence for impeachment violates the Due
Process Clause of the Fourteenth Amendment.  *Doyle*, 426 U.S. 610; U.S.
Const. amend. XIV.  In *Doyle*, the United States Supreme Court noted that
Miranda warnings give the criminal defendant implicit assurances that his
silence will carry no penalty.  *Id*. at 618.  "In such circumstances, it would be
fundamentally unfair and a deprivation of due process to allow the arrested
person's silence to be used to impeach an explanation subsequently offered at
trial."  *Id*. at 619.  Indiana recognizes the rule set out in *Doyle* and does not
allow prosecutors to use a defendant's post-Miranda silence as a means of
impeachment.  *Sylvester v. State*, 698 N.E.2d 1126, 1130 (Ind. 1998).  The rule

also applies to the use of a defendant's silence as affirmative proof in the State's case-in-chief. *Kubsch v. State*, 784 N.E.2d 905, 914 (Ind. 2003).[3]

[12] The post-conviction court found that during the State's case-in-chief, the prosecutor "inappropriately highlighted" that Stidham did not ask any questions when presented with a search warrant for his DNA and that it was "improper" for the State to comment on such during its closing argument. *Appellant's Appendix* at 92. Nevertheless, the post-conviction court concluded that, affording due deference to counsel's strategy, Stidham's counsel did not render deficient performance by not objecting to the testimony of the detectives as set out above. The court noted counsel's years of experience and his testimony at the post-conviction hearing that sometimes he would not object if he did not believe an issue had a persuasive effect on the jury. The court also found that the detectives' responses showed that Stidham was cooperative, and thus, they had some value to him. We also note that the challenged responses were minimal in terms of the overall testimony provided by the detectives.

[13] The post-conviction court did conclude that trial counsel rendered deficient performance by not objecting to the State's comments during closing argument and not asking that the jury be admonished or for a curative instruction. Clearly, the State's comments during closing constituted a *Doyle* violation as the

---

[3] In a case report prepared by Detective Dowell, he stated that when he and Detective Amberger confronted Stidham with the search warrant for his DNA, he advised Stidham of his Miranda rights and Stidham acknowledged that he understood his rights.

State asked the jury to consider Stidham's silence when confronted with the DNA search warrant as evidence of his guilt.

[14] The mere existence of a *Doyle* violation is not, however, per se grounds for relief. *Doyle* violations are subject to a harmless error review. *Henson v. State*, 514 N.E.2d 1064, 1067 (Ind. 1987); *Bieghler v. State*, 481 N.E.2d 78, 92 (Ind. 1985), *cert. denied* (1986). To determine whether a *Doyle* error is harmless, a reviewing court must ask if, absent the prosecutor's allusion to the defendant's post-*Miranda* silence, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *See Yurina v. State*, 474 N.E.2d 93, 96-97 (Ind. 1985). Essentially, a *Doyle* violation is harmless "only when the court, after assessing the record as a whole to determine the probable impact of the improper evidence on the jury, can conclude beyond a reasonable doubt that the error did not influence the jury's verdict." *Henson*, 514 N.E.2d at 1067. Indiana courts look to the following five factors to determine whether a *Doyle* violation constitutes harmless error: 1) the use to which the prosecution puts the post-arrest silence; 2) who elected to pursue the line of questioning; 3) the quantum of other evidence indicative of guilt; 4) the intensity and frequency of the reference; and 5) the availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions. *Id*.

[15] Having reviewed the record, we agree with the post-conviction court's assessment of the factors and its conclusion that any *Doyle* violation was harmless beyond a reasonable doubt. As the post-conviction court found, the intensity and frequency of the references to Stidham's silence were "extremely

low" and the State did not "harp" on this evidence as there was other substantial evidence of guilt. *Appellant's Appendix* at 92.

[16]     Aside from the challenged testimony and comment, the State presented evidence that Stidham told Kirkhoff that he picked up two women from a bar and had sexual intercourse with one of them; Stidham had access to a vehicle that matched the description of the car A.T. and R.M. got into; R.M. remembered specific details about the drive, including that they were headed to the south side of Lafayette, and she was pushed out of the vehicle and approached a house on the south side of Lafayette to get help; A.T. was cold, upset, and crying when she was located at a gas station on the south side of Lafayette; Stidham's cell phone records showed that he was on the south side of Lafayette when the attack occurred even though he lives on the west side of Lafayette; A.T. was unconscious in the back seat of the vehicle and a medical examination revealed that she suffered vaginal injuries consistent with non-consensual intercourse; and Stidham's DNA matched DNA that was found on A.T.'s right buttock and the chances of another Caucasian male meeting the same profile were 1 in 4.5 million. In light of the foregoing, we are confident that the references to Stidham's silence as set our herein did not contribute to the jury's verdict.

[17]     We now turn to Stidham's argument that his trial counsel was ineffective for failing to object to admission of evidence pertaining to A.T.'s camera being found among Stidham's possessions. The Fourth Amendment to the United States Constitution requires search warrants to "particularly describ[e] the place

to be searched, and the persons or things to be seized." The particularity requirement restricts the scope of the search, authorizing seizure of only those things described in the warrant. *Lee v. State*, 715 N.E.2d 1289, 1290 (Ind. Ct. App. 1999). If a search and seizure exceeds the scope of the search warrant, it is unconstitutional. *Sidener v. State*, 55 N.E.3d 380, 383 (Ind. Ct. App. 2016). Here, the search warrant identified four specific items law enforcement believed A.T. was missing: a black jacket, a red purse, a wallet, and a cell phone. Seizure of A.T.'s camera therefore exceeded the scope of the warrant and was unconstitutional.

[18] The post-conviction court concluded that trial counsel could have filed a motion to suppress the camera and related evidence and that such motion would have been successful because the camera was seized outside the scope of the search warrant.[4] Rather than seeking to suppress the camera, Stidham's trial counsel's indicated that his strategy was to use pictures found on the camera to aid the defense. Specifically, Stidham's defense was that A.T. was so intoxicated that she did not remember the events of the night or even recognize Stidham. To explain how his DNA was found on A.T., Stidham testified that A.T. performed fellatio on him and that he ejaculated on her hand and that

---

[4] The post-conviction court properly concluded that the plain view doctrine does not apply. To seize evidence in plain view and not identified in a warrant, the initial intrusion must have been authorized under the Fourth Amendment, the items must have been in plain view, and the incriminating nature of the evidence must be immediately apparent. *Jones v. State*, 783 N.E.2d 1132, 1137 (Ind. 2003). The incriminating nature of the camera was not immediately apparent. Rather, it was seized because the officer executing the search warrant came across the camera in an unusual place. The officer was unable to confirm that the camera belonged to A.T. prior to seizing it.

after they went back into the bar, A.T. asked him to hold her camera. He claimed that he never saw her again that night. Trial counsel pointed out that the pictures taken from the camera showed A.T. partying and flirting with other men and suggested that A.T. had sexual intercourse with someone other than Stidham, which theory was supported by the fact that other DNA found in A.T.'s pants did not belong to Stidham. We will not second-guess trial counsel's strategy to use pictures from the camera found in Stidham's possession to support the defense. *See Davidson*, 763 N.E.2d at 446.

Strategy aside, Stidham has failed to show how he was prejudiced. Even if trial counsel had successfully moved to suppress evidence related to A.T.'s camera or objected to its admission at trial, we cannot say that there is a reasonable probability of a different outcome given the DNA evidence, cell phone location records, and witness testimony. Stidham has not established that the post-conviction court erred in denying him relief based on his claims of ineffective assistance of counsel.

Judgment affirmed.

Bailey, J. and Crone, J., concur.